## Staunton.

## Cox v. Cox.

### September 16, 1897.

1. CHANCERY PLEADING—*Jurisdiction—Plea in Abatement.*—Where a bill shows on its face jurisdiction of the court in which it is filed, no exception for want of such jurisdiction will be allowed unless taken by plea in abatement. Sec. 3260 Code.
2. TRUSTS—*Conveyance to One, Payment of Consideration by Another—Case at Bar.*—Whenever an estate is purchased in the name of one person, and the consideration is paid by another, a trust is created by operation of law in favor of the person furnishing the purchase money; and, when the relation of trustee and *cestui que trust* is once established, no subsequent dealing with the trust property by the trustee can alter the relation of the parties, or relieve the property of its trust character. The case at bar falls within these principles, and the appellant must be treated as a trustee for the benefit of the appellee, to the value of one-half of the proceeds of the land in controversy.

Argued at Wytheville.    Decided at Staunton.

Appeal from a decree of the Circuit Court of Wythe county pronounced February 22, 1896, in a suit in chancery wherein the appellee was the complainant, and the appellant was the defendant.

*Affirmed.*

The opinion states the case.

*Blair & Blair*, for the appellant.

*J. H. Fulton*, for the appellee.

HARRISON, J., delivered the opinion of the court.

This suit was instituted in the Circuit Court of Wythe county by A. G. Cox to recover from J. O. Cox, a resident of Memphis, Tenn., who was at the time temporarily in Wythe county, one-half of the proceeds of the sale of a certain tract of land alleged to have been held in trust by the defendant for the benefit of himself and the plaintiff, and to secure the same by attaching certain debts due the defendant from persons living in said county.

The defendant appeared, demurred to and answered the bill. Documentary evidence and depositions of witnesses were intro-duced on both sides, and, upon a final hearing, the Circuit Court. decided that the defendant held the land in trust for the benefit of himself and the plaintiff in equal moieties, and referred the case to a commissioner to settle certain accounts between the parties, in order to ascertain the exact sum due the plaintiff from the proceeds of sale then in the hands of the defendant.

From this decree the defendant, J. O. Cox, was allowed an appeal to this court.

The contention that the lower court had no jurisdiction of the cause is not tenable. The bill shows on its face proper mat-ter for the jurisdiction of the court, and where this is the case section 3260 of the Code provides that no exception for want of jurisdiction shall be allowed, unless it be taken by plea in abatement. If there had been any valid objection to the juris-diction in this case, no plea in abatement having been filed, it would be now too late to raise the question.

It appears from the allegations of the bill and the evidence in support thereof that in the year 1856 William Cox and John W. Taylor, residents of Tazewell county, purchased of the executor of James Taylor, deceased, land warrant No. 26828 for 20,000 acres, with the intention of locating certain lands in Tazewell county which they thought were vacant and liable to entry. It is alleged that the lands which they proposed to enter

were claimed by a friend and neighbor, and that, in order to avoid any interruption of the long standing friendship that had existed between them, it was determined to have the warrant assigned to, and the entry made in the name of a third person who would hold the same, as well as the patent, if obtained, for their benefit. For this purpose the appellant, J. O. Cox, a son of William, then living and doing business as a merchant in Wytheville, Va., was selected.

By virtue of this warrant the parties made their proposed entry in the name of J. O. Cox. This led, as was expected, to litigation, in which those claiming adversely to Cox and Taylor were successful, and prevented the emanation of a grant.

After the loss of this suit, William Cox and John W. Taylor sold this land warrant, still standing assigned to, and in the name of appellant, to Montgomery Cox, another son of William. Without conference with his brother, J. O. Cox, and so far as the record shows without his knowledge, Montgomery proceeded to McDowell county, then Virginia, now West Virginia, where, in January, 1860, by virtue of this warrant he located 9,988 acres of land on Panther creek in that county, and obtained a patent therefor in the name of J. O. Cox.

In 1862, Montgomery Cox died intestate and unmarried, survived by his father, William Cox, and his two brothers, J. O., and A. G. Cox. The patent for this land, in the name of J. O. Cox, and the plats and surveys thereof were found among the papers of Montgomery Cox by his administrator, A. G. Cox. In 1867, it being discovered that the grant to this land had emanated a few days after the secession of the State, and as the boundaries thereof lay in McDowell county, W. Va., it was deemed advisable, by the father and two brothers, in order to prevent complications and perfect the title, that J. O. Cox should take steps at once, in his own name, to obtain a grant for the same land from the state of West Virginia, and that he should hold the same in trust for the benefit of his father, then the sole heir of his son, Montgomery Cox, deceased, using the

former entry patent from the state of Virginia in his name, as the ground of his right to a grant from the state of West Virginia. The bill further alleges that at this time the father was recognized as the equitable owner of the land, and that an understanding was then had that the father would convey his equitable interest in equal moieties to the two sons, reserving to himself some interest in the proceeds of sale when made, and reserving to the two sons a lien for such sums as each might be entitled to for time and money spent in perfecting the title and negotiating a sale; that, with this understanding, J. O. Cox obtained a grant from the state of West Virginia. This property was subsequently sold for taxes, in consequence of which the parties were involved in a protracted and expensive litigation in which they finally triumphed. Subsequently another suit was brought by a creditor of the Coxes, seeking to subject the land to the payment of debt, which involved much litigation, and was not finally settled until the land was sold. During all these years the appellee, A. G. Cox, was actively engaged in defending these suits, and in efforts to sell the land, having plats and surveys made, travelling to and from the land over a wild and broken country, at great cost, labor, and loss of time from other employment, until 1889 when his labors resulted in a sale at $26,805.62.

During these years the appellant lived continuously in Memphis, Tenn., prosecuting his private business, and took no active part in the labors performed by the appellee in connection with the land. It does appear, however, that he paid the taxes on the land, and furnished a large part of the money expended in defending suits, perfecting the title, &c.

After the sale was made, and appellant, who held the legal title, had executed a deed to the purchaser, and received and collected the entire purchase money, he, to the amazement of his brother, denied his right to any share in the proceeds of sale, and refused to make any settlement with him on account thereof.

Appellant in his answer denies all the allegations of the bill which seek to set up in appellee any claim to, or ownership in,

the land or the proceeds thereof, and avers that he was the lawful owner of the whole tract, and had borne the burden of paying taxes, and the cost of perfecting and defending the title; that appellee, in all he had done in connection with the land, was merely acting as agent under powers of attorney executed by appellant which recognized him as the owner; that he had from time to time paid appellee for his services, and had allowed him $500 out of the proceeds of sale; that the claim of appellee that the land was held by appellant in trust first for his father, and subsequently for himself and appellant, was an "afterthought," and had no foundation in fact.

The doctrine of resulting trusts is too well settled to require elaboration or citation of authority in its support.

"Whenever an estate is purchased in the name of one person, and the consideration is paid by another, a trust is created by operation of law in favor of the party paying the purchase money. The clear result of all the cases, without exception, is that a trust of a legal estate, whether freehold, leasehold or copyhold, whether taken in the names of the purchaser and others jointly, or in the names of others, without that of the purchaser, whether in one or several, whether jointly or successively, results to the person who advanced the purchase money. This rule has its foundation in the natural presumption, in the absence of all rebutting circumstances, that he who supplies the purchase money intends the purchase to be for his own benefit, and not for another, and that the conveyance in the name of another is a matter of convenience and arrangement between the parties for collateral purposes, and this rule is vindicated by the experience of mankind." 1 Perry on Trusts, (3rd Ed.), Secs. 125, 126.

In the light of these principles there is no difficulty in reaching the conclusion that appellant held this property in trust for the benefit, first, of his brother Montgomery Cox, secondly, for his father as the heir of Montgomery, and lastly, for the benefit of appellee and himself in equal moieties.

It clearly appears from the evidence of D. H. Harman, who in 1860 was surveyor of McDowell county, that the entry of 9,988 acres on Panther creek in that county was made by himself at the instance of Montgomery Cox, who was present in person with the warrant, accompanied the surveyor in his work, designated the lands to be surveyed, and paid the surveyor for the work when it was done; it appearing from other evidence that the cost of the survey alone was $150. This entry was made in the name of appellant in order to conform to the assignment on the back of the warrant, and the patent obtained in pursuance thereof was for the like reason issued in his name.

It is to be presumed that Montgomery Cox did the work incident to obtaining this patent, and paid for the same for his own benefit and not for another, and that he was willing to rely on the good faith of his brother, and did not doubt that he would readily make such transfer and conveyance in the future as might become necessary. It satisfactorily appears that appellant paid no part of the purchase price of the warrant, the cost of making the entry or obtaining the patent, and that, at the time of its purchase, he had no interest whatever in the land or the warrant, and most likely did not know of the existence of either. In the use of his name by Montgomery, appellant became the holder of the naked legal title for the benefit of his brother, and, in all of his subsequent dealings with the land, in perfecting the title, defending suits, giving powers of attorney to appellee to sell, and finally executing and delivering a deed to the purchaser, and collecting the purchase money, his relation of trustee to the subject was never changed.

When the relation of trustee and *cestui que trust* is once established, that no subsequent dealing with the trust property, by the trustee, can alter the relation between the parties, or relieve the property of its trust character, is a rule too well established to require argument. *Murry* v. *Sell,* 23 W. Va. 475.

That William Cox, the father, who died, a very old man,

before the sale was made, understood this to be the true relation of appellant to the property, is shown by his solemn act in 1883 when he executed and delivered to appellee a deed conveying him one-half the land, in which he sets forth in terms that Montgomery Cox had entered the land and obtained a patent therefor; that for certain reasons the patent was issued in the name of appellant, instead of that of his brother Montgomery; that Montgomery had died intestate and without issue, and that the grantor, his father, had become his heir to said lands, and desired that his two sons, the appellant and appellee, should have the same subject to a provision for himself out of the proceeds of sale. This deed was prepared with the exception that appellant, the holder of the legal title, would unite with his father therein. He, however, withheld his signature for the reason, as alleged, that he thought it best not to complicate the title; that a sale and conveyance could be more easily consummated if the title remained in one person.

That appellee understood the relation of appellant to the property, as holder of the legal title, to be that of trustee, is apparent from all the facts proven, and the circumstances of the case. It is inconceivable that appellee would, for more than twenty years, have devoted the time, labor, and money upon this property he is abundantly shown to have done, upon any other idea than that he was interested as an owner, and expected to share as such in the proceeds of the sale he was so earnestly endeavoring to make.

That appellant understood his true position to be that of trustee, with the expectation of eventually becoming the owner of one-half, is abundantly shown by his letters to appellee setting forth his needs, and urging him to make a sale as soon as possible.

It appears that at one time appellee was dissatisfied that he had no writing from either his father or brother recognizing his interest in the land, and, on August 22, 1881, appellant wrote him from Memphis a letter in which he says:

"I expected you to manage the case in Sam Graham's hands the best you can, you know everything about it that I do, and much more. The land stands in my name, and you can very well be a witness. When we can make a sale of it, of course I will do whatever is just and proper between you and father, or make such division as father thinks proper. I would not now say this, but you appear to be somewhat dissatisfied because you have no written pledge from me to do so. I don't want to say anything to you that would make you an incompetent witness in the case."

This is an acknowledgment that his position was that of trustee, and that his father had the right to dictate what should be done with the proceeds of sale when made. This letter also furnishes a further reason for appellant's subsequent failure to unite with his father in the deed to appellee: it appearing to be his view that appellee's competency as a witness in the pending suit would be affected if he appeared of record to be interested.

On the 6th of June, 1883, appellant writes to his brother: "I think we had better get C. R. Boyd to make a report on the minerals, &c., as early as possible. Another thing that would enhance the value of the property would be to get the survey in a more compact shape than it now stands, either by purchase or getting the privilege of selling with ours at some fixed price."

Again, in the same letter, in speaking of an agent he was negotiating with, he says: "He asked to have a minimum price put on the property, and all he could get over that amount he would divide, say $25,000 was the price I named, and he could get $50,000, he would divide the last $25,000, giving us $37,500, and he would get $12,500 for commissions. This appears to be the best shape we could put it on the market."

Again he says: "I don't expect we could get C. R. Boyd to make the trip for less than $100, which I will willingly pay. * * * We, of course, will have to get up a map of the country from," etc.

In a letter written June 16, 1883, he says: "I don't think I

ought to sign Sam's obligation, it is binding on us, but he don't obligate himself to do anything * * * * *. Now, if we sell, I expect to pay a liberal price. I feel that it will be due to Sam Graham to pay him liberally, &c., if we should be so fortunate as to make a sale outside of the combination he has gone into. I yet think we can get my price, $5.00, if we can sell at all."

On the 26th of June, 1884, he writes: "I received your and father's letter yesterday, also the papers you enclosed. I feel flattered with the prospect of our ability in the near future to realize a good price for the Panther creek tract of land, by the approach of two lines of railroad. Should they both be finished down the Dry Fork and Tug, it would seem that our fullest expectations will be realized, and that we may yet be the possessors of enough to put us beyond want."

On March 16, 1885, he writes: "We must act promptly or we will be sold out. This tract is too valuable to be lost now, for I think the time is not far distant when it will bring $7.50 to $10.00 per acre, which amount would place all of us on a good footing where we could live in comfort on the interest of it. * * * * See if something can't be done. If you get the orders to keep off the sale it will eventually come, and may be at a time when we are no more able to hold it than now."

Then follows his letter of June, 1885, wherein he says: "If we could get a good price for the Sandy land we could all live in comfort and ease, and be able to raise the children and educate them well."

On January 23, 1888, he writes: "I hope you will be able to make sale of the land at $3.00 per acre, which will be satisfactory even then, if we have to allow the 5 per cent. commission. This to make prompt sale. If I felt able to hold the land, I don't know of anything that would probably pay better to held. I want to get some money, and also to get rid of the annoying suit that has worried us so long. It does appear that so long as we hold that land we are to be annoyed in this way. I

could invest what surplus there would be left after settling with Taylor, and make probably as much as the advance in the land might be. I want to sell, and any trade within reason you can make will be confirmed by me."

March 15, 1888, he writes: "My answer met your approval, and I think we ought to get more money for the property than his offer of $2.00, less his commissions. We have waited so long I do hope we can get enough to make us comfortable without such a strain as we have lived so long, and so much annoyance and vexation. * * * * If we can get $3.00 I say let it go. I want the money, and I suppose you do, too. Father and mother both want some just now."

On April 26, 1888, appellant again writes to his brother a letter in which he says: "Should you be so fortunate as to make a sale, let me know, and I will come out if I can be of use whatever. If we can sell, I can use the money and make double that I now do, and also put you in the same sort of position. * * * * If I had half what we hope to get for the land, with my experience and acquaintance here I am satisfied that I could make twice what I now do * * * * *. We must sell this summer sure; that suit cannot be staved off much longer, and I cannot raise enough to pay the judgment that is likely to go against us. So you understand my situation, and hope you will push matters. It will put us both on a good basis, and will make us independent."

These letters written by appellant from Memphis to his brother, the appellee, while the latter was engaged in his labors in connection with this land, are utterly at war with his present position that the claim now asserted against him is an afterthought. The language used is susceptible of but one interpretation, and demonstrates that up to the time of the sale he understood his position to be that of trustee; and that, after the sale, he became himself the victim of the "afterthought" he ascribes to his brother.

Appellant, in his answer and deposition, relies not only upon

the legal title, and the acts showing ownership exercised by him, which were the necessary consequence of his having in him the legal title, but also upon expressions used by appellee in certain letters to him, which are made part of the record.

These letters were written by appellee chiefly in answer to those received from his brother, giving an account of his labors, the progress of suits, the prospect of selling &c. And, in speaking of the land, he frequently uses the expression "your land," which is the language chiefly relied on as an admission of appellant's claim. The understanding being that appellant was to be the owner of one-half the land, it might well be contended that the expression "your land" had reference to his half interest, and was not inconsistent with the joint interest therein of appellee. However this may be, the expressions in these letters are of little consequence in view of the abundant evidence found in the record establishing the truth of the case stated in appellee's bill.

For these reasons the decree appealed from must be affirmed.

*Affirmed.*