## Staunton

### GLADYS E. KELLOW v. RUDOLPH BUMGARDNER, JR., ADMR. C. T. A. OF THE ESTATE OF GEORGE D. CRABBS, DECEASED.

September 8, 1954.

Record No. 4244.

Present, Hudgins, C.J., and Miller, Smith and Whittle, JJ.

The opinion states the case.

*George M. Cochran, Leonard A. Weakley* and *Taft, Stettinius & Hollister,* for the appellant.

*Timberlake & Smith* and *Sanford A. Headley,* for the appellee.

SMITH, J., delivered the opinion of the court.

This suit was instituted by Rudolph Bumgardner, Jr., administrator *c. t. a.* of George D. Crabbs, deceased, against Gladys E. Kellow, to establish a resulting trust in certain real estate in Augusta and Rockingham counties, Virginia, known as the Grand Caverns, the legal title to which was conveyed to Gladys E. Kellow on September 20, 1943, by Holly Stover, Incorporated. The bill of complaint also sought an accounting of the rents and profits from the operation of this property from the time it was acquired by Miss Kellow.

A demurrer to the bill on the ground that the devisees of George D. Crabbs, deceased, were necessary parties to the suit, was overruled. Thereupon, Miss Kellow filed her answer in which she asserted that she had paid for the property with her own funds and that Crabbs had not paid any part of either the down payment or subsequent pay-

ments to the seller. Accordingly, she denied that Crabbs or his estate had any interest in the property. Although she admitted that she had received from Crabbs 49 percent of the purchase price, she claimed these sums were received from him in discharge of obligations or by way of gifts.

Voluminous depositions were taken and many exhibits introduced. The trial court, in its decree of June 8, 1953, held that the estate of Crabbs was the beneficiary of a resulting trust in the Grand Caverns property to the extent of an undivided 49/100 interest and was entitled to an accounting of the rents and profits during the period that Miss Kellow held legal title.

The assignments of error raise two basic questions. 1. Did the trial court err in overruling the demurrer and holding that the devisees of Crabbs were not necessary parties? 2. Did the court err in finding that the evidence established a resulting trust in favor of the estate of Crabbs to the extent of an undivided 49/100 interest in the Grand Caverns property?

The evidence discloses that Crabbs was a resident of Cincinnati, Ohio, and a leading figure in the industrial, commercial and social life of that city. His principal business connection was with The Philip Carey Manufacturing Company of Cincinnati, in which he held the position of president. He also held the position of director in several other large corporations, and as a civic leader achieved great prominence for his successful leadership in the organization, development and construction of a combined railroad terminal in Cincinnati.

In 1929 and subsequent years Crabbs suffered financial reverses culminating in 1940 in a composition agreement with his creditors under which his assets were turned over to a trustee for the benefit of his creditors. During the same year he lost control of The Philip Carey Manufacturing Company but was retained as chairman of the board of directors at a salary of $50,000.00 a year and was later

retired on a pension of $25,000.00 a year. By the time of his death in 1948, Crabbs had rallied financially and left an estate of more than $800,000.00, exclusive of any claimed interest in the property involved in this litigation, but including $245,200.00 inherited from his wife upon her death on February 7, 1947.

Miss Kellow, who was 43 years of age when the Grand Caverns property was bought in 1943, began work in 1915 as a stenographer for The Philip Carey Manufacturing Company and in 1920 became private secretary to Crabbs, a position she held until his death on September 29, 1948. Miss Kellow saved her money, invested wisely and accumulated a substantial estate, from which she made numerous loans to Crabbs during his financial distress.

In 1943 Miss Kellow began a search for a business enterprise to provide a livelihood for herself and her dependent mother and in June of that year learned that the Grand Caverns property was for sale. On August 12, 1943, she inspected the property and submitted an offer to the real estate agent, J. G. Sheets. This offer was accepted and a contract of sale was executed on August 26, 1943, at Cincinnati, by Miss Kellow and Holly Stover, Incorporated, by Holly Stover, president and owner, and a deposit of $500.00 was made by her. The sale was completed by delivery of a deed to Miss Kellow on September 20, 1943, in Staunton, Virginia. In payment of the purchase price, she paid, in addition to the $500.00 deposit, $24,500.00 in cash and the balance of the agreed purchase price of $150,000.00 was evidenced by her bonds in the aggregate sum of $125,000.00, payable to Holly Stover, Incorporated and secured by a contemporaneous deed of trust.

The deferred purchase money bonds were paid as they matured by personal checks of Miss Kellow until the outstanding debt was reduced to $92,000.00, which was settled in full on December 10, 1947 for the sum of $85,000.00. Although all payments on account of the purchase price were made by Miss Kellow, 49 percent of these payments

consisted of money furnished her by Crabbs from his Lincoln National Bank checking account. The first advancement was made on September 15, 1943, in the form of his check payable to her in the sum of $12,250.00, being 49 percent of the cash payment made by her for the property.

After the property was acquired, Crabbs executed and delivered to Miss Kellow his notes payable to her in amounts representing 49 percent of each of the deferred purchase price bonds executed by her, which notes matured simultaneously with her bonds. These notes were paid by him to her as they matured until the final settlement between Miss Kellow and Holly Stover, Incorporated. During the month prior to this final settlement, Crabbs made four payments to Miss Kellow in the aggregate sum of 49 percent of $85,000.00 or $41,650.00. He also delivered to her his checks representing 49 percent of the fees and expenses incident to and incurred by her in connection with the acquisition of Grand Caverns. In addition, he made small payments to her from time to time which she used to defray operating expenses of the property.

The stubs of the checks used to make payments to Miss Kellow contained various notations, the first of which bears this language: "G. E. Kellow 49% interest in Grand Caverns.' Thereafter the stub notations read: "G. E. Kellow note," "G. E. Kellow 49%," "49% on G. C.," "G. E. Kellow G. C.," or "G. E. Kellow."

From the time Miss Kellow became interested in the Grand Caverns, Crabbs extended to her his advice and assistance and through his efforts substantial concessions were secured from the owner, not only at the time of the purchase of the property but also thereafter in securing without cost certain personal property, a waiver of interest, and a reduction of the balance of the purchase price. However, from the beginning of Crabbs' connection with the acquisition of the property he made it clear, both orally and in writing, to all with whom he dealt that his only interest in

the Grand Caverns was that of friend and adviser of Miss Kellow. Also, he at no time reported in his income tax returns any income or claimed any deductions for operating expenses or depreciation of the property.

On May 15, 1947, Crabbs executed his will, the first bequest of which was $25,000.00 to Miss Kellow. After providing for bequests to two other employees, the residue of his estate was divided into thirds and left in trust for the benefit of or outright to his next of kin, consisting of a brother and nieces and nephews. The Lincoln National Bank of Cincinnati, Ohio, and Homer Gray, a nephew, were named and qualified as executors and trustees and given full power and authority to sell and convey any and all of his real estate. The will contained no reference to the Grand Caverns property.

On January 12, 1948, which was after the death of his wife, final payment of the debt on Grand Caverns, and the release of the deed of trust, Crabbs gave Miss Kellow the following signed memorandum:

"To Whom it May Concern:

"In connection with the several checks issued to Miss Gladys E. Kellow from my Lincoln National Bank checking account, I now wish to state that said checks were issued in re-payment of loans of cash and stocks that Miss Kellow made to me from time to time several years ago and that said payments to her discharge said indebtedness, and at this time there are no existing unpaid loans or obligations between us.

George D. Crabbs."

■ The first question presented by the assignments of error is whether the trial court erred in overruling the demurrer, which was based upon the contention that title to the real estate of Crabbs passed to his devisees at his death and that this suit could only be maintained by them. This contention ignores the plain language of the decedent's

will which gave his executors full and complete power and authority to sell, exchange and mortgage his real estate.

In *Mills* v. *Mills*, 28 Gratt. (69 Va.) 442, the testator created various trusts in the residuum of his estate and made certain bequests to named individuals. The executors, besides being designated trustees to execute the various trusts, were empowered to liquidate the estate and to sell the testator's real estate. It was there said:

"The effect of the will was to break the descent and devolve the title to the land upon the executors, instead of the heirs of the testator. The executors had not a mere naked power of sale, but a power coupled with an interest, and most important trusts. The estate did not devolve on the heirs for an instant, either at law or in equity, but enured at once to the executors for the purposes of the will." 28 Gratt. (69 Va.) at page 460. *Mosby* v. *Mosby*, 9 Gratt. (50 Va.) 584.

Under Code, § 64-136 the powers, interest, rights and duties relative to the testator's Virginia real estate devolve upon the administrator *c. t. a.* The trial court was therefore clearly correct in overruling the demurrer.

■ The second question presented for our determination is whether the evidence is sufficient to establish a resulting trust.

As early as 1879 this court said: "It is not necessary, at this day, to enter into an investigation of the principles of law governing resulting trusts. The doctrine generally, if not universally recognized is, that when a conveyance of real estate is made to one person, and the consideration paid by another, it is presumed that the party advancing the money intended a benefit to himself, and accordingly a resulting trust is raised in his behalf. But when the conveyance is taken to a wife or child, or to any other person for whom the purchaser is under an obligation to provide, no such presumption attaches." *Irvine* v. *Greever*, 32 Gratt. (73 Va.) 411, 417. See *Coons* v. *Coons*, 106 Va. 572, 56 S. E. 576; *Jesser* v. *Armentrout*, 100 Va. 666, 42 S. E. 681;

*Cox* v. *Cox*, 95 Va. 173, 27 S. E. 834; *Beecher* v. *Wilson, Burns & Co.*, 84 Va. 813, 6 S. E. 209; *Donaghe* v. *Tams*, 81 Va. 132; *Miller* v. *Blose's Exr.*, 30 Gratt. (71 Va.) 744.

Hence, it is well settled that when one person pays, or assumes payment of the purchase price money or a part thereof, for property, but has the legal title conveyed to another with no express mention of a trust on the face of the conveyance, a resulting trust arises from the transaction, and the person named as grantee in the conveyance is a trustee for the party from whom the consideration proceeded. Nothing else appearing, the title holder is *prima facie* presumed to hold the title in trust for the party who purchased and paid the purchase money. However, the so-called purchaser must have paid the purchase money as his own and not as an agent of the title holder, nor as a loan or gift to the latter. A resulting trust is a mere creature of equity, founded upon presumptive intention and designed to carry that intention into effect, not to defeat it. *Page* v. *Page*, 132 Va. 63, 110 S. E. 370; *DeBaun's Exr.* v. *DeBaun*, 119 Va. 85, 89 S. E. 239; *Clary* v. *Spain*, 119 Va. 58, 89 S. E. 130; *Taylor* v. *Delaney*, 118 Va. 203, 86 S. E. 831; *Straley* v. *Esser*, 117 Va. 135, 83 S. E. 1075; *Lee* v. *Elliott & Co.*, 113 Va. 618, 75 S. E. 146. See also, Lile's Notes on Equity Jurisprudence, p. 54; 2 Minor on Real Property, (2d ed., Ribble), § 459, p. 611; 5 Thompson on Real Property, (perm. ed.), § 2372, p. 68; 3 Scott on Trusts, § 440, p. 2237.

While the parties in this case agree on the general principles applicable to resulting trusts and that the burden of proof is on the person claiming the trust to establish it by clear and convincing evidence, they disagree as to the application of this rule of burden of proof and the effect of the *prima facie* presumption arising upon the proof of payment by one party and the receipt of title by another.

The rule controlling these questions, which is almost universally followed, is stated in 3 Scott on Trusts, § 458, p. 2303, thus:

"Where a person claims that property is held upon a resulting trust for him on the ground that he paid the purchase price, he has the burden of establishing the fact he paid the purchase price. A resulting trust, however, will not arise if it was the intention of the payor to make a gift or loan to the grantee. The grantee may, therefore, introduce evidence that it was the intention of the payor to make a gift or loan to him. If there is evidence, either direct or circumstantial that a gift or loan was intended, the burden of proof is on the payor to establish the fact that no gift or loan was intended. In other words, if the payor shows that he paid the purchase price with his money, the burden of going forward with evidence that it was paid by way of gift or loan to the grantee is on the grantee; but if evidence is introduced tending to show that it was paid by way of gift or loan, the ultimate burden of proof is on the payor to establish his claim to a resulting trust, by showing that the money was paid as his money with the intention of obtaining the beneficial interest in the property, and was not paid as a gift or loan to the grantee with the intention that the grantee should have the beneficial interest in the property."

The existence of a resulting trust thus depends upon an equitable presumption of intention, based upon the natural precept that one who advances the purchase money for real property is entitled to its benefits. Therefore, after it has been shown that payment of all or a part of the purchase price for property has been paid by one person and title thereto has been placed in the name of another, the factor which will determine whether the title is to be impressed with a trust in favor of the payor is the intention of the party providing the purchase money. If no evidence of intention is available, then the presumed intention will stand; but if there is evidence that the person who provided the money had some intention other than to secure the benefits for himself, the presumed intention fails and no resulting trust will be recognized. *Straley* v. *Esser, supra; Lee* v. *Elliott & Co., supra; Cox* v. *Cox, supra; Beecher* v. *Wilson,*

*Burns & Co., supra; Borst* v. *Nalle,* 28 Gratt. (69 Va.) 423.

It is well settled that he who asserts a resulting trust in real property, which is clearly an effort to controvert a duly executed and recorded deed, must establish it by clear and convincing evidence, or, as stated in *Moorman* v. *Arthur,* 90 Va. 455, 477, 18 S. E. 869, the evidence must be "clear, cogent, and explicit." While the burden of proof has been variously stated, it is clear that a mere preponderance of the evidence is not sufficient to establish a resulting trust. *Miller* v. *Miller,* 99 Va. 125, 37 S. E. 792; *McDevitt* v. *Frantz,* 85 Va. 740, 8 S. E. 642; *Phelps* v. *Seeley,* 22 Gratt. (63 Va.) 573; *Coons* v. *Coons, supra.*

The evidence before us undisputably shows that Crabbs advanced to Miss Kellow sums of money equal to 49 percent of the purchase price paid by her for the property here involved and 49 percent of certain operating expenses, and that the property was conveyed to her. The vital issue in the case involves the effect of these advancements and the intent of Crabbs in making them. For evidence of his intent to acquire an interest in the Grand Caverns property, the administrator can only point to the entries made upon the stubs of the checks with which Crabbs made advancements to Miss Kellow. On the other hand, there is convincing evidence which shows Crabbs intended that Miss Kellow acquire the entire beneficial interest in the property.

Briefly summarized, this evidence shows that Miss Kellow initiated the inquiry and inspection of Grand Caverns prior to the sale, she made the arrangements with the real estate broker to view the property, outlined the terms under which she was willing to buy and then requested Crabbs to look at the property and give her his advice. After the property was acquired Miss Kellow and her mother moved to Grand Caverns which they operated and where they made their home for a substantial part of each year. However, she continued in the employment of Crabbs who remained in Cincinnati but visited the Kellows for a few days each year at the Grand Caverns. While he was present at business

conferences relating to the acquisition and operation of the property, he made it clear from the beginning of the negotiations for its purchase until his death that Miss Kellow was the sole owner of the property and that his interest was solely that of friend and adviser.

On his deathbed in Harrisonburg, Virginia, Crabbs told his butler-chauffeur that Miss Kellow did not owe a dollar on the Grand Caverns, and at that time he also told his nephew and co-executor that "they", meaning Miss Kellow and her mother, had the caverns paid for. John H. Clippinger, an attorney of Cincinnati, Ohio, testified that Crabbs told him he felt obligated to Miss Kellow because she had remained loyal to him and made loans to him when he was in great need; that he had helped her buy the caves in Virginia; that some people might consider it a gift but he considered it a discharge of obligations and that he had given Miss Kellow an instrument in writing to protect her against any claims that might be made for any funds given to her.

In the first bequest of his will, executed in 1947, after his wife's death and prior to the January 12, 1948 memorandum, Crabbs left Miss Kellow $25,000.00. However, the will made no reference of any interest in the Grand Caverns property.

Another significant fact is that Crabbs did not take any deductions on his income tax returns for losses in the operation of the Grand Caverns, all of which losses were claimed by Miss Kellow for the years 1943 through 1948 and averaged more than $10,000.00 a year. Surely a man of Crabbs' business ability would not have overlooked an opportunity to claim approximately $5,000.00 a year in tax losses. This failure to use a substantial tax saving is persuasive evidence that he never intended to acquire any interest in the property.

Apart from oral disclaimers, Crabbs went much further to show that he owned no part of Grand Caverns. After all the notes had been paid he gave Miss Kellow a signed memorandum which recited that the checks "from my Lin-

coln National Bank checking account" were issued to Miss Kellow in repayment of loans of cash and stocks made by her to him several years previously, "and at this time there are no existing unpaid loans or obligations between us."

Thus, by this written memorandum and his other repeated disavowals, Crabbs clearly demonstrated a lack of any intention to receive the benefit of any resulting trust in the Grand Caverns. Moreover, during the several weeks of his illness after signing the memorandum and up until his death, Crabbs was mentally alert and conversed with his nephew and co-executor, among others, yet he asserted no claim to the property even though he mentioned it to several different persons.

Accordingly, we hold that it has not been established by clear and convincing evidence that the estate of George D. Crabbs is the beneficiary of a resulting trust in the Grand Caverns property.

Therefore the decree is reversed and the bill dismissed.

*Reversed and final decree.*