Gordon C. **WILLIS** and Jean H. Willis, Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 83–1622.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1984.

Decided June 7, 1984.

---

Robert J. Tyrrell, Bethesda, Md. (Ash, Bauersfeld, Burton, Hendricks & Tyrrell, Bethesda, Md., on brief), for appellants.

Lisa A. Prager, Tax Div., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Ann Belanger Durney, Tax Div., Dept. of Justice, Washington, D.C., on brief), for appellee.

Before WINTER, Chief Judge, WIDENER, Circuit Judge, and PECK,* Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge:

Gordon C. Willis (Taxpayer) brings this appeal from an adverse decision of the United States Tax Court. He challenges the court's finding of a deficiency in his 1976 federal income tax return (tax return) and its direction to pay an addition to tax according to § 6651(a)(1) of the Internal Revenue Code of 1954[1] (IRC) due to his late filing of the return.

In April, 1976, Charles Caveness, a real estate developer, met with Bill Walters, a realtor from Charleston, South Carolina. Knowing that Caveness was interested in real estate development, Walters introduced him to Hal Ravenel who was connected with Sea Pines Company, a parent corporation of Isle of Palms Beach and Racquet Club Company, Inc. (Racquet Club), formerly known as the Charleston Beach and Racquet Club Company, Inc. Racquet Club, which was experiencing financial difficulties, owned 1500 acres of extremely valuable land located near Isle of Palms, South Carolina, consisting of some 2.5 miles of beach front property, 800 acres of which were immediately suitable for residential development. During a series of meetings, the three men discussed the chances of Caveness getting an option

---

* Honorable John W. Peck, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

1. Statutory references hereinafter refer to the Internal Revenue Code of 1954.

to purchase the Isle of Palms property. As a result of the discussions, Ravenel introduced Caveness to Raymond Finch, a principal in Finch Properties, a real estate partnership. Finch Properties owned twenty-seven per cent of the outstanding stock of Racquet Club and held a note and mortgage of Sea Pines on the 1500 acres of land with a face value of $2,639,028.75. Since Finch had not previously done business with Caveness, but was familiar with Ravenel, Finch granted Ravenel an exclusive sales listing, permitting him to present offers to purchase Finch Properties' interest in Racquet Club. The terms of this agreement, dated April 7, 1976, provided that Ravenel could sell an option to purchase the assets of Finch Properties until April 19, 1976 at 5:00 p.m. The option itself was available for up to thirty-seven days at a rate of $1,000 per day. Should the payments not be made, the option would lapse. Such payments were not refundable. Ravenel thereupon apparently entered into an agreement with Caveness by which Caveness purchased the option, but the form of the agreement does not appear in the record.

Interested in entering into this option agreement, Caveness contacted Taxpayer. Caveness and Taxpayer had been long-time business associates, having, among other things, jointly participated in a manufacturing enterprise. Taxpayer, the owner and president of Rockydale Quarries Corporation (Rockydale), was heavily involved in real estate investments and became interested in the land acquisition proposal. Caveness showed Taxpayer aerial photographs of the 1500 acre tract of land and informed Taxpayer that he held an option to purchase the land from Finch Properties. Caveness and Taxpayer testified at the hearing before the Tax Court that they could not recall whether Caveness had shown Taxpayer a copy of the April 7, 1976 exclusive sales listing or the agreement between Ravenel and Caveness prior to

May 24. The parties thereafter entered into an agreement dated April 19, 1976, transferring a one-half interest in an option "to purchase approximately 1500 acres of ocean front property near Charleston, South Carolina, known as the Isle of Palms, from Finch Properties...." Taxpayer was to pay $7,000 per week for five weeks in order to preserve the option. Both parties agreed to share equally any profits derived from development of the 1500 acres.

Taxpayer made the weekly payments required by this agreement to the South Carolina National Bank by cashier's check, placed in escrow for Finch Properties. Such payments occurred on April 19, April 23, May 3, May 10, May 19, and May 26, 1976.

The parties agree that sometime after April 19, 1976, Caveness, following repeated requests from Taxpayer, showed Taxpayer a copy of the April 7, 1976 exclusive sales listing. Recognizing that it did not provide for an option to purchase the land, Taxpayer sent Caveness back to Finch to secure such an agreement. Caveness entered into an agreement with Finch dated May 24, 1976, granting him an option to purchase the stock and other assets of Finch Properties, effective May 24, 1976. Paragraph 10 of the agreement between Caveness and Finch provided that any payments made prior to the effective date of the Option and Agreement would be included as a part of the sales price. The agreement also specified that the life of the option could be extended at a rate of $7,000 per week. After the above-mentioned May 26, 1976 payment, however, no additional payments to Finch Properties were made and the unexercised option lapsed.

In his 1976 federal income tax return [2] Taxpayer deducted the six payments to Finch, totalling $42,000, plus $14 spent in the purchase of the cashier's checks, as an ordinary business loss. Though it was required to be filed on or before July 15,

2. Taxpayer's return was actually a joint return filed with his wife, Jean H. Willis.

1977,[3] the return was not acknowledged by the IRS until July 27, 1977.

The IRS determined a deficiency in Taxpayer's 1976 tax return, finding that the deduction taken for failure to exercise the option should have been reported as a capital loss rather than as an ordinary business loss. The IRS declared that the option was actually to purchase capital assets from Finch Properties, including stock, contractual rights, and the mortgage on the 1500 acres of land, rather than land purchased as part of a profit-seeking venture. IRS also assessed Taxpayer an addition to tax pursuant to IRC § 6651(a)(1) for late filing of his tax return.

At the Tax Court hearing, Taxpayer testified that he had been led to believe he was purchasing from Caveness an option to acquire the Isle of Palms property rather than an option to purchase capital assets from Finch Properties. He stated that the April 19, 1976 agreement between himself and Caveness, which expressly described the Isle of Palms property as that property covered by the option, as well as several cashier's checks with the notation "land option", supported his position. On cross-examination, when asked why he had not attempted to get his money back once the true nature of the option became clear, Taxpayer declared that pursuant to his agreement, the payments would constitute a portion of the sale price had the option been exercised. Concerning his failure to timely file his 1976 tax return, Taxpayer testified that the ministerial inadvertence of his trusted employee, Lynwood W. Lucas, had caused the delay, and therefore such inadvertence constituted reasonable cause under IRC § 6651(a)(1).

The Tax Court disagreed with both of Taxpayer's arguments. Viewing the transaction among Caveness, Ravenel, Finch, Walters, and Taxpayer as a whole, the court declared that Taxpayer had indeed purchased an option to acquire capital assets, thus entitling him to deduct only a

capital loss. The Tax Court further held that even though Taxpayer's failure to timely file his tax return was not due to willful neglect, Taxpayer failed to show reasonable cause to excuse his late filing. Taxpayer now appeals to this court pursuant to IRC § 7482(a).

Section 165(a) of the IRC permits an individual taxpayer to deduct ordinary business losses sustained during the tax year which are not otherwise compensated for by insurance. Such deductions, however, are limited by IRC § 165(c) & (f). Section 165(c)(2), relied on by Taxpayer, permits deduction of losses sustained in transactions entered into for profit. Such losses are considered ordinary losses. In the case of capital assets, IRC § 165(f), combined with IRC § 1211, allows a taxpayer to deduct only a capital loss. The IRC treats a loss incurred when an option is unexercised as either an ordinary loss, or as a capital loss, depending upon the character of the property covered in the option. On one hand, as Taxpayer argues, if the property is land, acquired as part of a profit-seeking venture, the loss resulting from the failure to exercise that option is an ordinary loss. If, as the IRS determined, and the Tax Court found, Taxpayer actually had an option to acquire capital assets, he may deduct only the dollar value of the capital loss.

Whether a taxpayer is entitled to an ordinary or capital loss is a question of fact depending on the circumstances in the particular case. The primary focus is on the character of the property itself and the true substance of the overall transaction, rather than the form assigned to it by the parties. The taxpayer has the burden of proving entitlement to ordinary loss treatment as well as overcoming the presumption that he did not acquire an option to purchase capital assets where the IRS has so determined. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). Our function on review is limited to

---

**3.** Taxpayer had received an extension from April 15, 1977 due to difficulties in securing

certain tax information unrelated to this case.

a determination of whether the Tax Court's finding of a capital loss is clearly erroneous. *Commissioner v. Duberstein*, 363 U.S. 278, 290–91, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960); *NCNB Corp. v. United States*, 684 F.2d 285, 287 (4th Cir.1982); IRC § 7482(a).

■ The record in this case clearly shows that Taxpayer thought he was acquiring an option to purchase the Isle of Palms property, rather than acquiring capital assets from Finch Properties. Caveness, a long-time business associate and trusted friend, represented to Taxpayer that he, Caveness, had an option to purchase the Isle of Palms property. Reasonably relying on these representations, as evidenced by the language of the April 19, 1976 agreement with Caveness, Taxpayer, a successful real estate investor for nearly twenty years, made a series of $7,000 payments by cashier's check, many of which declared on their face that they were in payment for a "land option". That land, the record establishes, was a very valuable piece of residential and recreational real estate, having a face value of over $2,000,000. When questioned concerning his knowledge of the April 7, 1976 exclusive sales listing agreement, Taxpayer testified that at some point he did see it, but could not recall exactly when. However, as noted earlier, the record is unclear as to just when or if Taxpayer became aware of the provisions of the agreement prior to May 24. Once having seen the exclusive sales listing, but still honestly relying on the claims of Caveness, Taxpayer instructed Caveness to secure from Finch a written option to purchase the Isle of Palms property in order to substantiate his claims. Even though he did not attempt to recover the payments previously made to Finch once the true character of the property

became clear by the terms of the May 24, 1976 option agreement secured by Caveness from Finch, Taxpayer made no additional payments to extend the life of the option after May 26, 1976. This last payment, Taxpayer testified, was made before he had seen the May 24 option. Considering the overall facts and circumstances of this case, we conclude Taxpayer is entitled to deduct payments made to Finch Properties as an ordinary loss rather than as a capital loss.

We turn to Taxpayer's contention that the failure to timely file his 1976 tax return, due to the inadvertent error of his corporate secretary, constituted a reasonable cause in the untimeliness. After careful consideration of the circumstances, we agree.

As he had done in previous years, Taxpayer sought the services of an accounting firm in the preparation of his tax return. After it was completed, Taxpayer signed the form on June 27, 1977. He then turned the tax return over to Lucas, Rockydale's secretary and comptroller, instructing Lucas to draw and endorse a company check to cover his tax liability, withdraw that amount from his personal account, and then mail the return to the IRS.

Section 6651(a)(1) of the IRC mandates imposition of an addition to tax of up to twenty-five per cent of the tax liability where a taxpayer fails to timely file his federal income tax return.[4] The penalty, however, is excused if the taxpayer can prove that the failure to timely file was not due to willful neglect, and, at the same time, prove the failure was due to a reasonable cause. Regulation 301.6651–1(c)(1) defines "reasonable cause" as "ordinary business prudence in providing for payment of [taxpayer's] tax liability."[5]

**4.** Section 6651(a)(1) in pertinent part provides: (a) *Addition to the Tax.—In case of failure—* (1) to file any return required under authority of subchapter A of chapter 61, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not

more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate....

**5.** Since all parties agree that Taxpayer was not willfully negligent, we need not address this branch of the test.

Efforts by courts to apply this standard have led to a myriad of conflicting interpretations. Most courts have construed "reasonable cause" quite narrowly, generally refusing to excuse imposition of the IRC § 6651(a)(1) penalty where a taxpayer claims that he relied on a third party who inadvertently failed to timely file his tax return. *Sanderling, Inc. v. Commissioner*, 571 F.2d 174, 178–79 (3rd Cir.1978) (reliance on CPA to file return who failed to do so does not constitute reasonable cause where taxpayer made no effort to ensure return was filed); *United States v. Kroll*, 547 F.2d 393, 396–97 (7th Cir.1977) (passive reliance on estate attorney to timely file estate return who subsequently fails to do so does not excuse imposition of penalty); *Estate of Geraci v. Commissioner*, 502 F.2d 1148, 1149–50 (6th Cir.1974) (per curiam) (same), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975); *Logan Lumber Co. v. Commissioner*, 365 F.2d 846, 853–54 (5th Cir.1966) (reliance on accountant to file return who erroneously failed to do so not reasonable cause); *Ferrando v. United States*, 245 F.2d 582, 588 (9th Cir.1957) (failure by estate lawyer to timely file return for client; penalty on taxpayer properly imposed). The Tax Court, while taking a similar view, has on a number of occasions permitted avoidance of the penalty where a taxpayer can demonstrate a history of timely filings or an established business routine which has resulted in timely filings. *Bouvelt Realty, Inc. v. Commissioner*, 46 BTA 45 (1942); *Marshall v. Commissioner*, 41 BTA 1064 (1940); *Carnie-Goudie Mfg. Co. v. Commissioner*, 18 BTA 893 (1930). Overall, while expressly declaring that taxpayers have a non-delegable duty to timely file their returns and must be encouraged to actively ensure they are thusly filed, courts have implicitly been concerned that a more liberal reading of "reasonable cause" potentially could spark an explosion of inadvertent late filings for a variety of proffered reasons.

The Seventh Circuit, recognizing that the statute does not mandate a per se refusal to excuse any inadvertent errors, yet concerned with preventing a flood of dubious late filings, endeavored to develop a more flexible approach based on a case by case analysis. *Boyle v. United States*, 710 F.2d 1251 (7th Cir.1983), *cert. granted*, —— U.S. ——, 104 S.Ct. 1676, 80 L.Ed.2d 152 (1984); *Rohrabaugh v. United States*, 611 F.2d 211 (7th Cir.1979). *But see Fleming v. United States*, 648 F.2d 1122 (7th Cir.1981); *Kroll, supra*. In *Rohrabaugh*, the executrix of a large estate was assessed a penalty under IRC § 6651(a)(1) for the late filing of an estate tax return. The executrix, a receptionist/telephone operator, unaware of the complexities and ever changing intricacies of the tax law, had retained an attorney. She supplied the attorney all necessary information, and repeatedly telephoned him for progress reports, but he inadvertently failed to file the necessary estate tax return. The IRS imposed an addition to tax for late filing. In finding the penalty inappropriate the court declared that where an individual, inexperienced in tax matters contacts a competent expert, such as an accountant or attorney, makes complete disclosures of information concerning his tax return to that expert, and maintains continual involvement in the preparation of the return, an inadvertent failure by the third party to timely file would be strong evidence of reasonable cause. The court was also impressed with the taxpayer's immediate filing once the error was discovered. The court was careful to point out that each case of an inadvertent error is unique and that an analysis of the particular facts in a case is of paramount importance. *See also Boyle, supra* (where attorney inadvertently filed return for executor in untimely fashion, addition to tax excused because executor, the president of an earth moving and grading company, provided all necessary information to attorney and attempted to see that tax return was timely filed).

By considering a taxpayer's past history of timely tax filings, a taxpayer's

exercise of careful business prudence in contacting capable and bona fide assistance from tax experts if reasonably necessary, a taxpayer's full disclosure of all relevant tax information to that expert, and a taxpayer's diligent efforts to ensure that the preparation of the tax return is completed, a court can find that an inadvertent error resulting in a late filing constitutes reasonable cause for purposes of IRC § 6651(a)(1) while assuring itself that equity for all parties is done. Finding that this test is in harmony with the plain and unambiguous language of IRC § 6651(a)(1) and that a per se rule barring all inadvertent errors would be inconsistent therewith, we apply it to the facts of this case.

■ Taxpayer, plainly exercising careful business prudence, sought the assistance of a capable accounting firm in the preparation of his 1976 tax return. Upon receipt of the completed return, Taxpayer and his trusted secretary-comptroller, Lucas, scrupulously reviewed the contents of the return. On June 27, 1977, eighteen days before the return was due, Taxpayer, satisfied that the return was correct, signed it. He then instructed Lucas to draw and endorse a corporate check, covering his tax liability, to transfer the necessary funds from his own personal account thereafter, and then mail the form and check to IRS. Despite having performed these tasks on a number of occasions in the past, Lucas, after drawing and endorsing the check, mislaid the tax return and inadvertently failed to mail it to IRS on or before July 15. Upon discovering his unfortunate oversight, Lucas immediately mailed the return to the IRS, accounting for the fact that it was acknowledged by IRS twelve days late.[6] Given these facts we conclude that the imposition of an IRC § 6651(a)(1) addition to tax is inappropriate. To otherwise hold, we think, would totally vitiate the meaning of "reasonable cause" and, in effect, strike this language from the statute.

Clearly, Taxpayer did all possible to see that the return was timely filed with IRS, with the possible exception of hand delivering the return to the Commissioner, a result we think Congress did not intend.

In sum, having considered all of the issues raised by Taxpayer, we conclude that we must reverse the decision of the Tax Court.

HARRISON L. WINTER, Chief Judge, concurring in part and dissenting in part:

Believing that what the taxpayer did rather than what he claims that he intended to do should govern the tax consequences of a business transaction, *see Lynch v. Commissioner*, 273 F.2d 867, 872 (2 Cir.1959), I respectfully dissent from that portion of the majority opinion dealing with the taxpayer's ability to claim an ordinary rather than a capital loss. I would affirm the Tax Court's imposition of liability for taxes arising from the taxpayer's mischaracterization of his losses. I agree with the majority's conclusion that the penalties imposed below for failure to timely file a return must be reversed and concur in that portion of the opinion.

I.

It is clear to me that, regardless of his initial beliefs or intentions, the taxpayer actually acquired an option to purchase capital assets. By agreement with Caveness made April 19, 1976, taxpayer acquired a one-half interest in a purported option obtained by Caveness to purchase land from Finch Properties, Inc. Of course, Caveness had no option to purchase land. He may have had an option to purchase various assets of Finch Properties, but in any event there is no dispute that on May 24, 1976, Caveness did obtain a formal written option for the purchase of stock, a note, a mortgage, and other contractual rights from Finch Properties. It is also

**6.** There is nothing in the record to indicate any other possible reason for the delay in filing

other than Lucas's carelessness in mislaying the return.

beyond dispute that the only consideration ever paid for the May 24, 1976, option came from the taxpayer. That consideration included the five weekly installments of $7,000 pursuant to the initial agreements between Caveness and Ravenel and an additional payment of $7,000 from the taxpayer on May 26, 1976, two days after Caveness' renegotiation with Finch Properties.[1]

## II.

Under these circumstances, there can be little question that the taxpayer was the beneficial owner of at least a one-half interest in the option Caveness obtained on May 24 if the extent of ownership is governed by the April 19, 1976, agreement between Caveness and taxpayer, and possibly the entire option if the furnishing of the consideration is determinative. Under Virginia law, a purchase-money resulting trust arises where a person establishes that he paid the purchase price for property but legal title to the property was conveyed to another without expressly mentioning the existence of a trust on the face of the conveyance. *Salyer v. Salyer*, 216 Va. 521, 526, 219 S.E.2d 889, 893 (1975); *Kellow v. Bumgardner*, 196 Va. 247, 253, 83 S.E.2d 391, 395 (1954). The payor must establish that no gift or loan was intended only if there is direct or circumstantial evidence that a gift or loan was intended. *Kellow, supra*. In this case, there is no evidence whatever that the payments were gifts or loans to Caveness. On the contrary, the taxpayer contends that they

were made for the express purpose of purchasing an interest in an option taxpayer believed Caveness possessed. Thus, taxpayer had an interest in the May 24, 1976, option even though he was not a party to it.

## III.

The fact that the taxpayer believed that the May 24 option was different from what it was in reality does not affect his beneficial ownership even though his belief, if fraudulently induced by Caveness, might give rise to an additional claim against Caveness. Nor are the taxpayer's rights affected by the fact that he made the payments pursuant to an agreement with Caveness expressly contemplating another type of option.

Taxpayer's contention that he thought that he did not possess or have the power to exercise the option obtained by Caveness is belied by his explanation for why he failed to attempt to recover any of his money from Finch Properties. He testified:

> ... But an attempt to get my money back, no, because I thought I was paying option money. And if you don't exercise an option, you lose your money. That's what you pay for, is the right to go ahead with the deal. Otherwise you lose.

It is obvious from his own testimony that the taxpayer realized that he, alone or in conjunction with Caveness, had the right to exercise the May 24 option even though it was not the option taxpayer now claims he

---

**1.** I cannot join the majority in wholesale acceptance of the taxpayer's version of these events. The majority concludes that taxpayer, a sophisticated developer for almost thirty years, was defrauded by his long-time associate Charles Caveness. Caveness apparently misrepresented the nature of an option he had obtained from Finch Properties, characterizing it to be one for the purchase of land rather than an option to purchase various capital assets. Taxpayer paid a total of $35,000 (five weekly installments of $7,000) to Finch before even looking at the agreement Caveness had entered into. When the taxpayer finally did look at that agreement and found that it did not provide for an option

to purchase land, he presumably "sent Caveness back to Finch to secure such an agreement." Caveness obtained another agreement on May 24, 1976. Subsequently, again without looking at the new agreement, the taxpayer paid an additional $7,000 to Finch Properties. To make the situation even more curious, the taxpayer has never attempted to recover any of these funds from either Finch Properties or Caveness. Under these circumstances, I am unwilling to accept the majority's characterization that the record "clearly shows" that the taxpayer was an unwitting victim in the machinations of his "long-time business associate and trusted friend" Caveness.

originally intended to purchase. As long as the taxpayer had the right to exercise the option to purchase capital assets, *in fact* he possessed that option. When he failed to exercise it, he incurred a capital loss rather than an ordinary loss. The taxpayer's original intention to acquire a different type of option is irrelevant to the tax consequences of what actually occurred. The majority correctly notes in this regard that "[t]he primary focus is on the character of the property itself and the true substance of the overall transaction, rather than the form assigned to it by the parties." I agree and cannot escape the conclusion that the true character of the taxpayer's failure to exercise his option was a capital loss because there is no dispute that the option actually obtained was one for the purchase of capital assets.

### IV.

If the taxpayer was defrauded in some way, the damages should properly be assessed against Caveness rather than the public purse. The taxpayer, for unexplained reasons, has chosen not to proceed against Caveness. The unfair result of the majority's holding is to shift a portion of the loss to the public.