*Decision will be entered under Rule 50.*

INTER-AMERICAN LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4775–68.    Filed June 15, 1971.

*Jack E. Evans*, for the petitioner.
*Sheldon M. Sisson*, for the respondent.

WITHEY, *Judge:* The Commissioner has determined deficiencies in petitioner's income taxes and assessed additions to tax thereon in the amounts and for the taxable years shown below:

| Taxable year ended | Deficiency | Addition to tax | |
| | | Sec. 6651(a) | Sec. 6653(a) |
| --- | --- | --- | --- |
| 1958 | $8, 372. 69 | $2, 007. 36 | $421. 47 |
| 1959 | 7, 684. 22 | 1, 921. 06 | 429. 68 |
| 1960 | 864. 37 | 206. 85 | 51. 37 |
| 1961 | 17, 780. 17 | 3, 561. 97 | 889. 01 |

Due to certain concessions, the primary issues to be decided are: (1) Whether during any or all of the years in issue, petitioner qualified as a life insurance company under section 801(a);[1] (2) whether certain expenses incurred in 1958 by officers of petitioner on a trip to Hawaii are deductible as ordinary and necessary business expenses; (3) whether petitioner is entitled in 1959 to an operations loss deduction in the amount of $5,478.87 resulting from an operations loss carryback claimed from 1962; and (4) whether petitioner is liable for the additions to tax assessed by respondent under sections 6651(a) and 6653(a).

### FINDINGS OF FACT

The petitioner is an Arizona corporation with its principal office at Phoenix, Ariz., at the time the petition was filed. The Federal income tax returns for the years in issue were filed with the district director of internal revenue at Phoenix, Ariz.

Prior to 1957, Arwell L. Pierce and his son Arthur owned substantial property in Mexico, including a corporation engaged in the lumber business, the assets of which they desired to transfer to the United States. H. Lavon Payne, Arwell Pierce's nephew, who was a C.P.A. and an attorney admitted to practice in Arizona, had extensive experience as an attorney consulting with life insurance companies and had been an officer of two life insurance companies. Since 1952, Payne's predominant business experience was in life insurance.

Sometime during 1957, Payne formulated the idea of forming an Arizona life insurance corporation for the purpose of handling the reinsurance business generated by other Arizona life insurance com-

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.

panies. Payne felt this would be a good business venture because of the good profit potential afforded by reinsurance business and because at that time there was no Arizona insurance company which was handling any reinsurance for the Arizona life insurance companies.

Payne advised the Pierces to transfer their property in Mexico to a life insurance company in the United States, which company would be formed to engage primarily in the reinsurance business. Payne sought a ruling from the Internal Revenue Service permitting a tax-free reorganization from the Mexican corporation to a domestic life insurance corporation but was unsuccessful because the primary business of the foreign corporation was lumber rather than life insurance. The Internal Revenue Service indicated it would issue a favorable ruling if the domestic corporation into which the assets were to be transferred were a lumber company or similar thereto. Payne then amended his ruling request by seeking a tax-free reorganization as a lumber company rather than as a life insurance company. The Internal Revenue Service issued a favorable ruling but stipulated that in order for the ruling to retain its effect, the newly formed lumber company would be required to be engaged in the lumber business for 3 years.

Pursuant to the above plan, Interstate Lumber & Development Co. (Interstate Lumber) and Inter-American Life Insurance Co. (Inter-American Life) were organized. From 1958 through 1961, Interstate Lumber was wholly owned by Arwell Pierce, his children, and grandchildren. Inter-American Life was incorporated as an Arizona domestic limited-stock life insurer on July 25, 1957, and received its certificate of authority to transact life insurance business in Arizona on December 30, 1957. The Mexican corporation's assets were then transferred to Interstate Lumber. Interstate Lumber in turn transferred to Inter-American Life approximately $200,000 of assets as loaned surplus under an agreement providing that the funds could not be returned except from the surplus funds of Inter-American Life. About the same time, Arwell Pierce contributed $40,000 in cash to Inter-American Life. The minimum capital required at that time in Arizona to form an insurance company was $37,500. The capital in excess of the required minimum capital was transferred to petitioner to fund the reserves petitioner would be required by Arizona law to maintain if it obtained the reinsurance business it sought.

Investment Life Insurance Co. (Investment Life) was incorporated in late 1957 and within a few months thereafter received its certificate of authority to do business as a life insurance company in Arizona. Payne and Arwell and Arthur Pierce each owned one-half of the outstanding stock originally issued by Investment Life. Additional

stock was issued and sold to the public later. Payne promoted and organized Investment Life in order to have an insurance company selling direct insurance which could feed reinsurance business to petitioner. During the years 1958 through 1961, Payne was employed by Investment Life serving as general manager, vice president, and secretary for which he received an annual salary of approximately $10,000. During this same period, he served as director, vice president, and secretary-treasurer for petitioner but neither he nor Pierce received any compensation from petitioner. During those same years, Payne also practiced law and accounting, operating from his office at Investment Life.

At various times during the years 1958, 1959, 1960, and 1961, Payne prepared on petitioner's behalf, filed for, and obtained the approval of the Arizona Insurance Department for various types of policy forms briefly described as follows:

| Name of policy | |
|---|---|
| Founders Policy (Two year term, convertible to limited payment life) | Participating. |
| Executive preferred whole life | Nonparticipating. |
| Preferred risk whole life | Do. |
| Whole life | Do. |
| 15 pay life | Do. |
| 20 pay life | Do. |
| 25 pay life | Do. |
| 30 pay life | Do. |
| Life paid up to 65 | Do. |
| 5 year term | Do. |
| 15 year term | Do. |
| Term to age 65 | Do. |
| Preferred economizer | Do. |
| 20 year endowment | Do. |
| 25 year endowment | Do. |
| 30 year endowment | Do. |
| Endowment at age 60 | Do. |
| Endowment at age 65 | Do. |
| 20 pay endowment at age 60 | Do. |
| 20 pay endowment at age 65 | Do. |
| Educator | Do. |
| Family group | Do. |

Petitioner could expand the coverage of the policies by attaching the following riders which petitioner filed for and obtained the approval of the Arizona Insurance Department: (1) Family Income Benefit; and (2) Mortgage Cancellation. These policy and rider forms were used by Investment Life as well as by petitioner. Investment Life maintained petitioner's policy files during the years 1958 through 1961. For the same period, Interstate Lumber's bookkeeper main-

tained petitioner's accounting records. Payne and Pierce received no compensation from petitioner for those years.

Petitioner did not maintain an active sales staff soliciting or selling insurance policies during the years 1958 through 1961 and paid sales commissions of only approximately $500 during that period.

Petitioner initially secured a small amount of reinsurance business from East-West Insurance Co. and Investment Life. Shortly thereafter, petitioner lost East-West's business to other larger reinsurance companies because petitioner was unable to provide the services that the larger reinsurance companies could provide. Among other things, petitioner's reinsurance competitors would underwrite the prospective policies to determine whether the applicant was a good insurance risk, provide sales and actuarial assistance, and provide policy forms to be used by the direct writing companies. Petitioner was able only to provide policy forms to the direct writing companies. After petitioner lost East-West's business, Investment Life was the source of nearly all of petitioner's reinsurance business throughout the years in issue.

From 1958 and continuing into 1961, petitioner had an agreement with Businessmen's Assurance Co. (BMA) under which petitioner ceded a portion of its reinsurance business to that company. The agreement was terminated on September 22, 1961, effective December 22, 1961, because petitioner had failed to pay some of the reinsurance premiums owed BMA.

Shortly after the reinsurance agreement was terminated, Arthur Pierce and Payne had a conference with the director of insurance of Arizona during which the director expressed his desire that Inter-American Life and Investment Life merge if they continued in the life insurance business. The director further suggested that Inter-American either aggressively get into the life insurance business or that it withdraw from the life insurance business and become only an investment company.

After this conference, in a letter dated December 28, 1961, Arthur Pierce and Payne proposed to the director that petitioner temporarily surrender its certificate of authority to transact insurance business and dispose of its policy liabilities, but that for the sake of convenience, petitioner be permitted to continue its corporate existence without modification and with the understanding that petitioner would reapply for a certificate of authority as soon as it was able to concentrate its energies in the sale of insurance. The reason for petitioner's past failure to aggressively engage in writing insurance was that the conditions of an Internal Revenue Service ruling required the Pierces to use most of their time promoting Interstate Lumber and, therefore, they were unable to manage petitioner effectively.

Petitioner did not surrender its certificate of authority but it entered into a reinsurance agreement with Republic National Life Insurance Co. (Republic) under which petitioner reinsured a major portion of its policy liabilities with the understanding that the policies would be ceded back to petitioner at such time as petitioner was in satisfactory financial position.

Total premiums earned, gross investment income, policies in force issued and reinsured, and total insurance in force by petitioner for the years shown are as follows:

| Year | Total premiums earned | Gross investment income | Policies in force issued and reinsured | Insurance in force |
|---|---|---|---|---|
| 1958 | $867.94 | $35,988.21 | 17 | $56,000 |
| 1959 | 1,554.76 | 31,195.60 | 280 | 802,550 |
| 1960 | 1,125.70 | 36,436.04 | 325 | 1,254,550 |
| 1961 | 1,421.98 | 33,815.34 | 424 | 1,336,500 |
| 1962 | 5,429.67 | 37,292.88 | 448 | 1,414,575 |

Most of the policies in force, issued and reinsured, listed above were reinsurance as opposed to directly written (issued) policies and Investment Life was the source of nearly all of those reinsurance policies. Almost all of the directly written policies were issued to Payne or to the Pierce family. Petitioner reinsured the bulk of its directly written policies and about 50 percent of its reinsurance policies with BMA and Republic during the year in issue.

For the years 1958 through 1961, petitioner's life insurance reserves as of the beginning and end of each year, the increase to the reserves (after deducting the investment yield), and the policyholders' share of the investment yield set aside pursuant to section 809 were as follows:

| Year | Beginning of year | End of year | Increase (decrease) | Policyholders' share of investment yield |
|---|---|---|---|---|
| 1958 | $9.29 | $501.15 | $491.86 | $6.46 |
| 1959 | 507.61 | 1,290.76 | 783.15 | 22.73 |
| 1960 | 1,311.07 | 1,567.63 | 256.56 | 36.44 |
| 1961 | 1,601.07 | 1,251.11 | (352.96) | 36.14 |

During the years in issue, petitioner's "life insurance reserves" were required by the laws of Arizona and comprised more than 50 percent of petitioner's "total reserves" as those terms are respectively defined in subsections 801(b) and (c). During the same years, petitioner's life insurance reserves were computed or estimated on the basis of recognized mortality or morbidity tables.

During 1960, petitioner paid a $413 dividend to its policyholders under section 811 which it deducted under section 809(d)(3).

During the year 1958, petitioner sold two houses described as follows:

|  | Sales price | Adjusted basis | Gains |
| --- | --- | --- | --- |
| House in Tucson, Ariz | $28,000.00 | $26,400.00 | $1,600.00 |
| House in Mesa, Ariz | 6,449.08 | 1,710.25 | 4,738.83 |

If it is determined that petitioner was a life insurance company under section 801 of the Code during 1958, the gains from those sales are excluded under section 817(d)[2] from petitioner's taxable income for that year.

During the years 1959, 1960, and 1961, petitioner sold the assets listed below. These assets were owned by petitioner on December 31, 1958, and were sold for more than their adjusted bases. The fair market value as of December 31, 1958, and the year of sale of the assets are as follows:

|  | Fair market value Dec. 31, 1958 | Year of sale |
| --- | --- | --- |
| Big Piney stock | $4,000.00 | 1959 |
| Real estate | 27,900.00 | 1959 |
| Coolidge property | 11,500.00 | 1960 |
| Improved lot | 2,700.00 | 1960 |
| Real estate lot | 7,000.00 | 1961 |
| Romney stock | 50,938.40 | 1961 |

If petitioner qualifies as a life insurance company under section 801 of the Code for the applicable years, then the gains from the sales of the assets shall be treated as provided under section 817(b)[3] (stepped-up basis treatment).

As a result of the liquidation of Romney Motor Lodge, Inc., a corporation in which petitioner held a 19¼-percent stock interest, peti-

[2] SEC. 817(d). GAIN ON TRANSACTIONS OCCURRING PRIOR TO JANUARY 1, 1959.—For purposes of this part, there shall be excluded any gain from the sale or exchange of a capital asset, and any gain considered as gain from the sale or exchange of a capital asset, resulting from sales or other dispositions of property prior to January 1, 1959. Any gain after December 31, 1958, resulting from the sale or other disposition of property prior to January 1, 1959, which, but for this sentence, would be taken into account under section 1231, shall not be taken into account under section 1231 for purposes of this part.

[3] SEC. 817(b). GAIN ON PROPERTY HELD ON DECEMBER 31, 1958, AND CERTAIN SUBSTITUTED PROPERTY ACQUIRED AFTER 1958.—

(1) PROPERTY HELD ON DECEMBER 31, 1958.—In the case of property held by the taxpayer on December 31, 1958, if—

(A) the fair market value of such property on such date exceeds the adjusted basis for determining gain as of such date, and

(B) the taxpayer has been a life insurance company at all times on and after December 31, 1958,

the gain on the sale or other disposition of such property shall be treated as an amount (not less than zero) equal to the amount by which the gain (determined without regard to this subsection) exceeds the difference between the fair market value on December 31, 1958, and the adjusted basis for determining gain as of such date.

tioner received in 1961 an undivided proportionate interest in a promissory note payable to Romney Motor Lodge, Inc. The note was executed on February 27, 1961, by Orinn Romney, Jr. (Romney), and his wife Norma. Romney subsequently suffered a nervous breakdown and in 1962 he was in a mental institution and was insolvent. Petitioner's board of directors determined in 1962 that the note was uncollectible and petitioner deducted $3,852.13, the amount of their interest in the note, as a bad debt in its income tax return for that year.

In 1958, Arwell and Arthur Pierce traveled to Hawaii. One of them had acquaintances in Hawaii who had expressed an interest in selling insurance in that State for petitioner. On their way to Hawaii, they stopped in Los Angeles and briefly explored the possibility of getting reinsurance business from the Los Angeles area, provided petitioner could qualify to do business in California. At the time of the trip, Inter-American Life was qualified to engage in the life insurance business only in Arizona. Petitioner reimbursed the Pierces for their travel expenses in the amount of $2,857.13, which amount petitioner claimed as a deduction.

Payne timely filed extension requests with enclosed tax payments on petitioner's behalf for the taxable years 1958 through 1962. He prepared the requests while preparing petitioner's annual statements and then gave the annual statements and other information to petitioner's accountants for the preparation of the tax returns. However, no returns were filed and in 1963 when petitioner's records were being audited by a firm of certified public accountants, it was brought to petitioner's attention that no returns had been filed for the years 1958 through 1961.

The filing date, extension request date, extension granted date, the amount of tax paid with the extension, and the tentative amounts of tax due for each of the years 1958 through 1962 were as follows:

| Year | Filing date | Date of extension request | Extension granted to | Amount of tax paid with extension request | Tentative amount of tax due |
|---|---|---|---|---|---|
| 1958 | 8/8/63 | 3/15/59 | 6/15/59 | $200 | $400 |
|  |  | 9/15/59 | 12/15/59 | 200 | -------- |
| 1959 | 8/5/63 | 3/15/60 | 6/15/60 | 150 | 300 |
|  |  | 6/14/60 | 9/15/60 | 150 | -------- |
| 1960 | 8/5/63 | 3/15/61 | 6/15/61 | 200 | 400 |
| 1961 | 8/5/63 | 3/15/62 | 6/15/62 | 200 | 400 |
| 1962 | 8/5/63 | 3/15/63 | 6/15/63 | 200 | 400 |

Petitioner timely filed its tax return for the year 1957 and its annual statements with the Arizona Insurance Department for 1958, 1959, 1960, 1961, and 1962, on the forms prescribed by that department

and by the National Association of Insurance Commissioners. All of the above forms were prepared by Payne.

In his notice of deficiency, respondent determined that for the taxable years 1958, 1959, 1960, and 1961, petitioner did not qualify as a life insurance company under section 801 of subtitle A, chapter 1 of subchapter L of the Code. Respondent accordingly recomputed petitioner's taxable income under subchapter B. Respondent determined further that over 80 percent of petitioner's reported gross income for the taxable years 1958, 1960, and 1961 consisted of dividends, interest, rents, and stock transactions and therefore petitioner qualified as a personal holding company as defined by section 542 of the Code and was subject to the personal holding company tax imposed by section 541 of the Code. In addition, respondent determined that part of the underpayment of tax for the taxable years 1958 through 1961 was due to negligence or intentional disregard of rules and regulations and that petitioner's income tax returns for the same taxable years were not timely filed and that petitioner had not shown that the failure to timely file those returns was due to reasonable cause. Respondent accordingly asserted 5-percent and 25-percent additions to the tax under sections 6653(a) and 6651(a) of the Code, respectively.

Respondent also disallowed deductions of $2,857.13 and $5,478.87, respectively, for expenses incurred by officers of petitioner on a trip to Hawaii in 1958 and for an operations loss carryback from 1962 to 1959.

## OPINION

The first issue for decision is whether petitioner was a life insurance company within the meaning of section 801(a) during the years 1958 through 1961.[4]

---

[4] Respondent asserted no deficiency for the year 1957 and determined that petitioner was a life insurance company during the year 1962.

Respondent's determination that petitioner was not a life insurance company during any of the years 1958 through 1961 resulted in the following:

(a) imposition of a personal holding company tax under sec. 541;

(b) disallowance of a deduction under sec. 809(d)(2) for an increase in reserves for 1958, 1959, and 1960;

(c) disallowance of the exclusion under sec. 809(a) of the policyholders' share of investment yield income for the years 1958, 1959, 1960, and 1961;

(d) disallowance of a deduction under sec. 809 for a dividend of $413 to policyholders for 1960;

(e) disallowance of a small business deduction provided for under sec. 809(d)(10) for the years 1958, 1959, 1960, and 1961;

(f) disallowance of certain operations loss deductions provided for under sec. 812; and

(g) disallowance of certain basis adjustments provided for under sec. 817(b).

Respondent's determination with respect to each of these items enumerated above is grounded upon his determination that petitioner was not a life insurance company under sec. 801(a) during those years. Accordingly, that portion of the deficiency attributable to these items will be sustained or not dependent upon whether or not, for the applicable taxable years, petitioner was a life insurance company under sec. 801(a).

Section 801, which is applicable to all the years involved, provides in pertinent part:

SEC. 801. DEFINITION OF LIFE INSURANCE COMPANY.

(a) LIFE INSURANCE COMPANY DEFINED.—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c)).

(b) LIFE INSURANCE RESERVES DEFINED.—

(1) IN GENERAL.—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) TOTAL RESERVES DEFINED.—For purposes of subsection (a), the term "total reserves" means—

(1) life insurance reserves,

(2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and

(3) all other insurance reserves required by law. \* \* \*

The parties have stipulated that during the years 1958 through 1961, petitioner's life insurance reserves comprised more than 50 percent of its total reserves; the life insurance reserves were computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest; and the life insurance reserves were required by Arizona law. Our only inquiry, therefore, is whether during the years 1958 through 1961, petitioner was "an insurance company * * * engaged in the business of issuing life insurance and annuity contracts" within the meaning of section 801(a).

Respondent's regulations, section 1.801-3(a)(1), provide in pertinent part as follows:

The term "insurance company" means a company whose primary and predominant business activity during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies. Thus, though its name, charter powers, and subjection to State insurance laws are significant in determining the business which a company is authorized and intends to carry on, it is the character of the business actually

done in the taxable year which determines whether a company is taxable as an insurance company under the Internal Revenue Code.

The question for decision, therefore, is whether petitioner's "primary and predominant business activity during * * * [each of the taxable years 1958 through 1961 was] the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies."

We note at the outset that petitioner's name, charter powers, and subjection to Arizona insurance laws are significant only in ascertaining the business which petitioner was authorized to conduct during the years 1958 through 1961. Whether petitioner is to be considered a life insurance company for Federal taxation purposes is determined by the character of its business actually done during each taxable year. Sec. 1.801-3(a)(1), Income Tax Regs., *supra*.

Total premiums earned, gross investment income, policies in force, issued and reinsured, and the total insurance in force by petitioner for the years in issue are as follows:

| Year | Total premiums earned | Gross investment income | Policies in force, issued and reinsured | Insurance in force |
|------|-----------------------|-------------------------|------------------------------------------|--------------------|
| 1958 | $867.94 | $35,988.21 | 17 | $56,000 |
| 1959 | 1,554.76 | 31,195.60 | 280 | 802,550 |
| 1960 | 1,125.70 | 36,436.04 | 325 | 1,254,550 |
| 1961 | 1,421.98 | 33,815.34 | 424 | 1,336,500 |

The above financial data clearly indicates that petitioner's primary and predominant source of income was from its investments and not from issuing insurance contracts or reinsuring risks underwritten by insurance companies. During each of the years in issue, petitioner's investment income far exceeded its earned premiums and the amounts of earned premiums were *de minimis* during those years.

It is equally as clear that petitioner's primary and predominant efforts were not expended in issuing insurance contracts or in reinsurance. Of the relatively few policies directly written by petitioner, nearly all were issued to Payne or the Pierce family. Also, Investment Life, in which Payne and Arwell and Arthur Pierce each owned a substantial stock interest, was the source of nearly all of the policies reinsured by petitioner. These facts, coupled with the fact that petitioner did not maintain an active sales staff soliciting or selling insurance policies during the years 1958 through 1961, indicate a lack of concentrated effort on petitioner's behalf toward its chartered purpose of engaging in the insurance business. By petitioner's own admission to the director of insurance of Arizona as of the end of 1961, petitioner had failed to aggressively engage in writing insurance and

was considering temporarily surrendering its certificate of authority to transact insurance business.

For the above reasons, we hold that during the years in issue, petitioner was not "an insurance company * * * engaged in the business of issuing life insurance" and hence, that petitioner was not a life insurance company within the meaning of section 801.

In deciding this issue, we have given due consideration to the problems indigenous to new life insurance companies, in particular, that the initial years of a new life insurance company's operations are generally difficult because the initial expenses incurred in "putting policies on the books" are greater than the premium received. S. Rept. No. 291, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 779. Our decision is not based upon a finding that petitioner, as a newly organized life insurance company, was unable to realize a profit from its insurance operations, but rather upon a finding that petitioner was not using its capital and efforts *primarily* in earning income from the issuance of insurance. *Cardinal Life Insurance Co.* v. *United States*, 300 F. Supp. 387 (N.D. Tex. 1969).

### Claimed Deductions for Travel Expenses

The next issue is whether or not petitioner is entitled to additional travel expenses of $2,857.13 for 1958 over the $284.20 allowed by respondent. There is no contention by respondent that the claimed deductions, if properly substantiated, would not be deductible as ordinary and necessary business expenses.[5]

No written records or documentary evidence of the claimed travel expenses were produced at trial because such evidence could not be found. The only evidence on this issue is Payne's testimony that the purpose of the trip was to explore the possibility of expanding petitioner's business to California and Hawaii, and the testimony of the examining revenue agent that during his audit of petitioner, he was shown hotel bills and airplane tickets relating to the trip. This testimony, absent other more specific testimony or written or documentary evidence, considering that petitioner was not qualified to engage in the life insurance business in the places visited on the trip, is insufficient to establish that the claimed deductions, or any part thereof, were purely business in nature. Since petitioner has not met his burden of proof, we hold for the respondent on this issue.

### Operations Loss Deduction

The next issue is whether petitioner is entitled in 1959 to an operations loss deduction in the amount of $5,478.87 resulting from an operations loss carryback from 1962.

---

[5] Since the deduction is claimed for a period prior to Jan. 1, 1962, the more stringent requirements imposed under sec. 274(d) of the Code are not applicable herein.

As a result of the liquidation of Romney Motor Lodge, Inc., a corporation in which petitioner held a 19¼-percent stock interest, petitioner received in 1961 an undivided proportionate interest in a promissory note payable to Romney Motor Lodge, Inc. The note was executed on February 27, 1961, by Orinn Romney, Jr., and his wife Norma. Romney subsequently suffered a nervous breakdown and in 1962 he was in a mental institution and was insolvent. Petitioner's board of directors determined in 1962 that the note was uncollectible and petitioner deducted $3,852.13, the amount of its interest in the note, as a bad debt in its income tax return for that year. Partly as a result of claiming the bad debt deductions of $3,852.13 in 1962, petitioner claimed an operations loss carryback in the amount of $5,478.87 from 1962 to 1959.

In his notice of deficiency, respondent disallowed in full the $5,478.87 operations loss carryback from 1962 to 1959 on the ground that petitioner qualified under section 801 as a life insurance company in 1962, but did not qualify in 1959, and that an operations loss may not be carried back from a qualifying year to a nonqualifying year. On brief, respondent argued further that the operations loss deduction should be disallowed at least with respect to the portion of the carryback equal to the bad debt deducted in 1962, because the note was worthless when received in 1961, and therefore no bad debt deduction should be allowed in 1962, thus reducing by $3,852.13 petitioner's 1962 loss from operations.

Since we agree with respondent's first contention that petitioner's operations loss deduction in 1959 should be disallowed in full, we do not reach the question of whether petitioner was entitled to a bad debt deduction in 1962.

Petitioner has made no attempt whatsoever to rebut respondent's argument that a life insurance company's operation loss may not be carried back from a qualifying year to a nonqualifying year which respondent, without discussion or citation of more than section 812(b) (2) and (d) (1), asserts is a "principle of insurance company taxation."

Petitioner seeks to deduct under section 812(a) an operations loss deduction of $5,478.87 for its taxable year 1959 by carrying back, pursuant to section 812(b) (1) (A) (i), a loss from operations allegedly incurred in 1962. Our question is whether a "life insurance" company may carry back, under the provisions of section 812 and subject to the 3-year limitation therein, a loss from operations from a taxable year during which the company qualified under section 801 as a life insurance company to a year when the same company did not satisfy the requirements under section 801. We hold that it may not.

Neither party has cited any authority relevant to this question and our research has disclosed no cases on point. The legislative history and respondent's regulations concerning the applicable Code sections

are silent on this point. We, therefore, base our decision upon our interpretation of the statute as it applies to this case.

Section 812 of the Code provides in pertinent part:

SEC. 812. OPERATIONS LOSS DEDUCTION.

(a) DEDUCTION ALLOWED.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of—

(1) the operations loss carryovers to such year, plus

(2) the operations loss carrybacks to such year.

For purposes of this part, the term "operations loss deduction" means the deduction allowed by this subsection.

(b) OPERATIONS LOSS CARRYBACKS AND CARRYOVERS.—

(1) YEARS TO WHICH LOSS MAY BE CARRIED.—

(A) IN GENERAL.—The loss from operations for any taxable year (hereinafter in this section referred to as the "loss year") beginning after December 31, 1954, shall be—

(i) an operations loss carryback to each of the 3 taxable years preceding the loss year,

(ii) an operations loss carryover to each of the 5 taxable years following the loss year, and

\* \* \* \* \* \* \*

(2) AMOUNT OF CARRYBACK AND CARRYOVERS.—The entire amount of the loss from operations for any loss year shall be carried to the earliest of the taxable years to which (by reason of paragraph (1)) such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess (if any) of the amount of such loss over the sum of the offsets (as defined in subsection (d)) for each of the prior taxable years to which such loss may be carried.

\* \* \* \* \* \* \*

(d) OFFSET DEFINED.—

(1) IN GENERAL.—For purposes of subsection (b)(2), the term "offset" means, with respect to any taxable year, an amount equal to that increase in the operations loss deduction for the taxable year which reduces the *life insurance company taxable income* (computed without regard to section 802 (b)(3)) for such year to zero. [Emphasis supplied.]

(2) OPERATIONS LOSS DEDUCTION.—For purposes of paragraph (1), the operations loss deduction for any taxable year shall be computed without regard to the loss from operations for the loss year or for any taxable year thereafter.

We have held above that petitioner was not a "life insurance company" during the year 1959. It therefore follows that petitioner had no "life insurance company taxable income" during that year. Section 812(b)(2) prescribes that a loss from operations be applied first to the earliest of the three preceding years and the remaining portion be applied consecutively to each of the other years. The remaining portion to be applied to each year is defined as "the amount of such loss over the sum of the offsets (as defined in subsection (d)) for each of the prior taxable years to which such loss may be carried." The term "offset" is defined in subsection (d)(1) as "an amount equal to that increase in

the operations loss deduction for the taxable year which reduces the *life insurance company taxable income* \* \* \* for such year to zero." Since petitioner had no "life insurance company taxable income" for the year 1959, there could be no offset for that year. Therefore, if petitioner were entitled to apply its 1962 loss from operations to its 1959 income, the loss could, under the statute, be carried *undiminished* to other taxable years, a result clearly not intended by Congress. We hold, therefore, that petitioner is not entitled in 1959, a year during which it was not a "life insurance company," to an operations loss deduction under section 812.

### Failure To File Timely Tax Returns for 1958 Through 1962

The respondent determined additions to tax pursuant to section 6651(a) for the petitioner's failure to file timely income tax returns for 1958 through 1961. Section 6651(a) provides for an addition to tax for the failure to file a return on or before the date it is due unless the taxpayer can show that such failure is due to reasonable cause and not willful neglect.

Respondent's regulations under section 6651(a) set out the following standard to determine reasonable cause: "if the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause."

Petitioner contends that its failure to file timely returns was due to reasonable cause since Payne supplied its accountants with the necessary information to prepare its Form 1120L income tax returns and relied upon them to do so, and further, that petitioner filed its returns immediately upon *first* learning in 1963 that the accountants had failed to file the returns.

We hold that petitioner's failure to file timely returns was not due to reasonable cause and accordingly we uphold respondent's assessment of the additions to tax under section 6651(a). Petitioner may not establish reasonable cause on the basis of furnishing the necessary information to its accountants and relying on them to file its income tax returns. This case is distinguishable from those cases where taxpayers were held to have exercised ordinary business care and prudence in relying upon an attorney or accountant where the return required to be filed timely was required by a law which a taxpayer, not an expert in tax matters, would not normally be aware of. See, e.g., *Reliance Factoring Corp.*, 15 T.C. 604 (1950). Petitioner knew the Form 1120L returns were required (Payne filed timely extension requests for those years) and cannot therefore be heard to argue that there was reasonable cause due to reliance upon the accountants.

*Negligent Failure To Pay Tax*

The respondent has determined additions to tax pursuant to section 6653(a) providing a 5-percent addition to tax when any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Petitioner was advised in 1963 by a firm of certified public accountants that its income tax returns for the years 1958 through 1961 had not been filed and that petitioner had not paid all of its income taxes due in some of those years. Since we have already found that petitioner did not exercise ordinary business care and prudence in relying upon its previous accountants to file its returns (and to advise petitioner of any income tax due thereon), and that petitioner knew such returns were required to be filed, we accordingly find that a part of the underpayment was due to negligence or intentional disregard of rules and regulations. We hold for the respondent on this issue.

*Decision will be entered under Rule 50.*