GORDON C. WILLIS AND JEAN N. WILLIS, Petitioners v COMMISSIONER OF INTERNAL REVENUE, Respondent
Willis v. Commissioner
Docket No. 1085-80.
United States Tax Court
T.C. Memo 1983-180; 1983 Tax Ct. Memo LEXIS 603; 45 T.C.M. (CCH) 1168; T.C.M. (RIA) 83180; April 4, 1983. *603 Held: W has failed to meet his burden of proving that he did not purchase individually or with an associate an option to purchase stock of a corporation, a mortgage and note, and certain contractual relationships and agreements. The option was permitted to expire. The amount paid by W for the forfeited option is deductible only as a short-term capital loss under section 1234 and subject to the limitations prescribed by sections 165(f) and 1211. Held further: Petitioners are liable for an addition to tax under section 6651(a) for failure to timely file their 1976 income tax return. Robert J. Tyrrell, for the petitioners. Scott D. Anderson, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the year 1976 in the amount of $22,706 and an addition to tax under section 6651(a)[1] in the amount of $1,135. Petitioners have conceded the correctness of all respondent's adjustments in the notice of deficiency except two, leaving as the only issues *604 for our resolution: (1) Whether petitioners sustained an ordinary loss of $42,000 in 1976; and (2) whether petitioners are liable for the addition to tax under section 6651(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners resided in Roanoke, Virginia, at the time of filing the petition herein. Petitioners filed a joint Federal income tax return for the year 1976 with the Internal Revenue Service Center, Memphis, Tennessee. In April 1976, Charles Caveness (Caveness) met Bill Walters (Walters), a realtor, from Charleston, South Carolina. Walters introduced Caveness to Hal Ravenel (Ravenel). Ravenel had been involved in some capacity with Sea Pines Company (Sea Pines), which had been involved in developing 1,500 acres on the Isle of Palms, South Carolina (herein the Land). In April and May of 1976, Isle of Palms Beach and Racquet Club Company, Inc. (herein the corporation), [2] owned the Land. The corporation was then a not wholly-owned subsidiary of Sea Pines, which was in financial difficulties in 1976. Finch Properties, a partnership, *605 owned approximately 27 percent of the outstanding stock of the corporation. Finch Properties also owned a note and mortgage of Sea Pines dated February 1, 1973, in the original principal amount of $2,639,028.75. Ravenel introduced Caveness to Raymon Finch (Finch), a principal in Finch Properties. Meetings ensued at which Caveness, Finch, Ravenel, and Walters were present. The purpose of these meetings was to discuss the possibility of Caveness obtaining an option. Since Finch did not know Caveness well, it was decided that Finch Properties would enter into an exclusive sales listing agreement (herein the agreement) with Ravenel to sell Finch Properties' interest in the corporation. Ravenel would subsequently enter into an agreement with Caveness. The agreement between Ravenel and Finch Properties was executed on April 7, 1976. The agreement gave Ravenel the exclusive right to present to Finch Properties an offer to purchase its stock in the corporation, a subordinated first mortgage, and all of Finch Properties' interests and rights in the corporation. *606 The agreement further authorized Ravenel to offer an option to purchase such stock, mortgage, and interests and rights. Any option offered by Ravenel was to be at a rate of $1,000 per day for a maximum of 37 days. Payments for the option were to be made weekly, with the first payment due on April 19, 1976. If the option were not exercised within 37 days, no option payments were to be refunded. In April 1976, after Ravenel had offered the option to Caveness, Caveness traveled to Roanoke and went to the office of petitioner Gordon C. Willis (Willis). Caveness desired to interest Willis, who had previously been associated with him in the development of a face protector for youth league baseball players, in joining with him in the acquisition and development of the Land. [3] *608 Caveness showed Willis aerial photographs and extensive plans for the development of the Land that had been prepared for Sea Pines. On April 19, 1976, Willis entered into an agreement with Caveness. This agreement read, in pertinent part, as follows: * * * Charles G. Caveness has on or about April 7, 1976 entered into an option agreement to purchase approximately 1500 acres of ocean front property near Charleston, *607 South Carolina, known as the Isle of Palms, from Finch Properties, Inc., of Columbia, South Carolina. [Emphasis supplied.] Said option agreement requires Caveness to pay the sum of $7,000 Dollars (seven thousand) per week for a term of five weeks in order to preserve the rights described in said option, and Whereas it is the desire to [sic] Caveness to sell to Willis one half interest in said option and Willis desires to purchase such interest, it is hereby agreed as follows: (a) Willis is to pay unto the South Carolina National Bank $7,000.00 each week for five weeks in escrow for Finch Properties, Inc.
(b) Caveness does hereby sell and assign unto Willis one half of all of his right, title and interest in said option. (c) Willis and Caveness shall share equally any and all profits, if any, from the sale or development of said option or from the sale of said property by Caveness. (d) In the event the said option is renewed, then the decision as to whether or not payments shall be continued, shall rest entirely with Willis. Willis and Caveness intended to acquire the Land and to form a joint venture known as "Cav and Associates" to develop and sell the Land.In this connection, Willis attempted to interest prospective investors. Willis sent cashier's checks in the total amount of $42,000 to the South Carolina National Bank, Columbia, South Carolina, the proceeds of which were received by Finch Properties. The table below indicates the amounts of the individual checks and the dates on which the checks were sent: Amount
Date
$7,000
April 19, 1976
7,000
April 23, 1976
7,000
May 3, 1976
7,000
May 10, 1976
7,000
May 19, 1976
7,000
May 26, 1976
Willis paid $14 to Colonial American National Bank for the cashier's checks. When Caveness showed a copy of the agreement between Ravenel and Finch Properties to Willis, Willis recognized that it was not an option to buy land and that Caveness was not a party to it. [4]Willis, on various occasions, asked Caveness to produce *609 an option to purchase the Land from Finch Properties. In fact, Caveness never had an option to purchase the Land. On May 24, 1976, Caveness, as purchaser, and Finch Properties, as seller, executed a document captioned "Agreement and Option." The agreement and option provided that it would become effective on May 24, 1976, if $7,000 was received by Finch Properties before 5:00 p.m. on that date. It gave Caveness the right to purchase a note and mortgage given to Finch Properties by Sea Pines, all the outstanding common stock of the corporation held by Finch Properties, and all of Finch Properties' contractual relationships and agreements with Sea Pines relative to the corporation and/or to the property owned by the corporation. Paragraph 10 of the agreement and option provided that Caveness would receive credit for payments made prior to its effective date. Caveness showed this agreement and option to Willis after *610 Willis had made the previously mentioned payments to Finch Properties. Since Willis failed to obtain an option to purchase the Land and to obtain additional financing or to interest prospective investors in the Land, he decided to abandon the payments that he had made to Finch Properties. On his tax return for the year 1976, Willis deducted $42,014 as an ordinary loss. The $42,014 represents the payments made by Willis to Finch Properties in April and May 1976 plus $14 paid for the cashier's checks by which he made such payments. [5]
The Internal Revenue Service had granted petitioners an extension of time for filing their 1976 joint Federal income tax return until July 15, 1977. The return was filed with the Internal Revenue Service Center, Memphis, Tennessee, on July 27, 1977. Petitioners' income tax returns were normally prepared by a firm of certified public accountants. An accountant with the firm would review the prepared return with Willis and Mr. Lynwood W. Lucas (Lucas), to determine if it was accurate. The 1976 return was *611 handled in this manner. Willis and his wife signed the return on June 27, 1977. On or about June 28, 1977, Willis gave petitioners' 1976 return to Lucas, who was secretary and comptroller of Rockydale Quarries Corporation (Rockydale). Willis, who was Rockydale's president, instructed Lucas to write a check of Rockydale for the tax liability shown on petitioners' return and to mail the return and check to the Internal Revenue Service on or before July 15, 1977. The amount of the check was to be charged against Willis' personal account with Rockydale. Lucas, however, failed to mail the return on or before July 15, 1977; he mailed it and two checks of Rockydale in payment of the tax liability shown on it on July 25, 1977. Petitioners had followed the same procedure in filing their tax returns for prior years, and their returns for all prior years were timely filed. OPINION The first issue presented for our decision is whether Willis sustained an ordinary loss in 1976 as a result of his payment of $42,000 to Finch Properties.
Section 165(a) authorizes a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. For individuals, the *612 deduction under section 165(a) is limited by section 165(c) to (1) losses incurred in a trade or business, (2) losses incurred in any transaction entered into for profit, and (3) certain casualty and theft losses in excess of $100. Under section 165(f) losses from the sale or exchange of capital assets are allowed only to the extent allowed in sections 1211 and 1212.
Sections 1234(a) and (b) provided [6] *613 as follows: SEC. 1234. OPTIONS TO BUY OR SELL. (a) Treatment of Gain or Loss.--Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him). (b) Special Rule for Loss Attributable to Failure to Exercise Option.--For purposes of subsection (a), if loss is attributable to failure to exercise a privilege or option, the privilege or option shall be deemed to have been sold or exchanged on the day it expired. Respondent has conceded that Willis suffered a loss of $42,000 in his trade or business of developing real estate for resale in 1976. The only issue is as to the character of the loss. Respondent contends that the loss was sustained by acquiring and then forfeiting an option to purchase stock of the corporation, a note, a mortgage, and other contractual rights and is deductible under section 1234 only as a short-term capital loss and subject to the limitations prescribed by section 1211. Petitioners maintain that Willis never acquired any option. Alternatively, petitioners contend that, if any option was acquired and forfeited by Willis, it was an option to purchase real estate that Willis intended to develop and sell in the ordinary course of his business.
As is generally the case respecting all other factual issues presented to this Court, respondent's determination is presumptively correct. Petitioners have the burden of proving it erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. In other words, to have Willis' *614 loss adjudged to be an ordinary loss, petitioners have the burden of showing that he acquired neither individually nor jointly with Caveness an option to purchase stock of the corporation, a note, a mortgage, and other contractual rights. [7]
We cannot decide this case by referring, as petitioners maintain we should, to the option which Willis claims that he thought he was acquiring, that is, an option to purchase real estate for development and resale. In point of fact, Caveness never received an option to purchase the Land. Therefore, Willis, as the assignee of Caveness, also never acquired an option to purchase the Land. In Jeffries v. Commissioner,158 F.2d 225 (5th Cir. 1946), affg. 5 T.C. 1338 (1945), the Court of Appeals stated (at 226): * * * Whether a transaction or result is taxable and what the tax is is not a matter to be determined in law upon considerations of general justice or equity. It is a matter of statutes and valid regulations, and what they mean. Neither is *615 it to be determined in fact upon considerations of what was intended to be done. Rather it is to be determined by what was done. * * * Taxation deals not with what was attempted to be done but with what was done. See United States v. Phellis,257 U.S. 156, 172 (1921) (stating "what was done, rather than the design and purpose of the participants, should be the test"); Weiss v. Stearn,285 F. 689, 691 (6th Cir. 1923), affd. 265 U.S. 242 (1924). Petitioners claim that Willis had neither an agreement nor an intent to acquire an option to purchase stock, a note, a mortgage and other contractual rights from Finch Properties. Willis' self-serving testimony that he had no intent to acquire such an option is unpersuasive. First, we agree with respondent that the implication from the record is that Finch Properties could have forced the corporation to give Willis and Caveness an option to purchase the Land. Sea Pines, the majority owner of the corporation, was in financial trouble in 1976. Finch Properties had lent a substantial amount of money to Sea Pines. It is not clear from the record that the loan was secured by a mortgage on the Land. However, there are indications in the record *616 that this may be the fact. It is also unclear from the record whether the understanding between Caveness and Finch was that Finch Properties would give Caveness an option to purchase the Land or an option to purchase the stock of the corporation, the note and mortgage, and other contractual rights. We note that petitioners failed to call Walters, Ravenel, Finch or a representative of Finch Properties as a witness. Since petitioners had the burden of proof, we infer that any such testimony would have been unfavorable to them. Stoumen v. Commissioner,208 F.2d 903, 907 (3rd Cir. 1953), affg. a Memorandum Opinion of this Court; Bresler v. Commissioner,65 T.C. 182, 188 (1975); Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Second, we cannot believe that a man of Willis' background and ability would continue to send $7,000 per week to an entity with which he was unfamiliar with no documentary evidence to satisfy him of the existence of an option purportedly assigned to him and the ownership of the property underlying the purported option. The record discloses that since 1954, Willis was successfully engaged, either as *617 a principal stockholder of various corporations or as a partner, in the business of developing real estate for resale. Willis and Caveness each claimed, at the trial of this case, to have a poor memory of when Caveness furnished Willis a copy of the exclusive sales listing agreement that Finch Properties had entered into with Ravenel. Certainly, when Caveness furnished Willis a copy of such agreement, Willis was put on notice that there was a possibility that Caveness had no option to purchase the Land. [8] *618 Third, an indication that Willis was aware that he had acquired the option to purchase stock of the corporation, a note, a mortgage, and certain contractual rights is Willis' decision to never attempt to recover the payments he had made to Finch Properties. Willis' testimony at trial demonstrates that, in his mind, there was no reason for him to undertake to recover the payments because the payments were not such option. [9] *619 We cannot accept petitioners' position that the fact that Caveness, rather than Willis, "technically" acquired an option to purchase the stock of the corporation, the note and mortgage, and other contractual rights is controlling. The principle that tax consequences are determined by the substance of a transaction, rather than its mere form, is well settled. Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945); Minnesota Tea Co. v. Helvering,302 U.S. 609 (1938); Gregory v. Helvering,293 U.S. 465 (1935). In consonance with this principle, courts have frequently focused on who has beneficial ownership of property, as opposed to mere legal title of it, to determine *620 the tax consequences of a transaction. Snyder v. Commissioner,66 T.C. 785, 791 (1976). See Schoenberg v. Commissioner,302 F.2d 416 (8th Cir. 1962), affg. a Memorandum Opinion of this Court; United States v. Brager Building & Land Corp.,124 F.2d 349, 351-352 (4th Cir. 1941); Yelencsics v. Commissioner,74 T.C. 1513, 1527 (1980). Under the circumstances present here, it appears that a purchase-money resulting trust would arise in behalf of Willis under Virginia law. A resulting trust arises where a person establishes by clear and convincing evidence that he paid the purchase price for property but legal title to the property was conveyed to another without expressly mentioning the existence of a trust on the face of the conveyance. Salyer v. Salyer,216 Va. 521, 526, 219 S.E.2d 889, 893 (1975); Kellow v. Bumgardner,196 Va. 247, 253, 83 S.E.2d 391, 395 (1954). The payor has the burden of establishing that no gift or loan was intended by him only if there is direct or circumstantial evidence that a gift or loan was intended. Kellow v. Bumgardner,supra.In the instant case, Willis provided the purchase price for the option to acquire the stock of the corporation, a note and mortgage, *621 and other contractual rights from Finch Properties. Caveness and Willis testified to the effect that their actual intent was to form a joint venture to develop the Land, over which they apparently would have gained control by exercising such option. No presumption, therefore, arises that the conveyance of the option to Caveness was intended to be a gift or loan of all rights under the option to him. In sum, we cannot find that petitioners have established that the payments in issue resulted in no acquisition by Willis either individually or jointly with Caveness of an option to purchase stock of the corporation, a mortgage, a note, and contractual rights. Accordingly, considering the option to be an acquisition of these properties, as section 1234(a) directs, we hold that the loss suffered by Willis on the lapse of the option was a short-term capital loss. [10] *622 The remaining question is whether petitioners are liable for the addition to tax imposed by section 6651(a)[11] *623 for failure to timely file their 1976 income tax return. The return admittedly was filed after the extension of time granted by the Internal Revenue Service for filing it had expired. Petitioners, however, contend that they have established that their tardy filing was due to a reasonable cause and not to willful neglect. Whether the failure to file on time was due to reasonable cause is primarily a question of fact to be determined from all the circumstances in a particular case. Estate of DiPalma v. Commissioner,71 T.C. 324, 327 (1978). Reasonable cause exists when a taxpayer exercises ordinary business care and prudence and is nevertheless unable to file the return within the prescribed period. Section 301.6651-1(c)(1), Proced. & Admin. Regs. Petitioners contend that a reasonable cause exists in the instant case because: (1) They relied entirely on Lucas to timely file their 1976 return; (2) the fully prepared and executed return was given to Lucas well in advance of its due date (as extended); (3) petitioners *624 had normally given their returns to Lucas to file in the past and he had timely filed them; and (4) through a purely inadvertent administrative oversight, the 1976 return was misplaced and, therefore, was not filed until 12 days after its due date. To support the proposition that these alleged facts are sufficient to constitute reasonable cause, petitioners cite Levine v. Commissioner,T.C. Memo. 1963-230 and United Aniline Co. v. Commissioner,T.C. Memo. 1962-60. Once a taxpayer has ascertained that a return is required, mere reliance on an agent to prepare and file the return is insufficient to constitute ordinary care. Mauldin v. Commissioner,60 T.C. 749, 762 (1973); Inter-American Life Insurance Co. v. Commissioner,56 T.C. 497, 511 (1971), affd. per curiam 469 F.2d 697 (9th Cir. 1972); Estate of Duttenhofer v. Commissioner,49 T.C. 200, 205-206 (1967), affd. per curiam 410 F.2d 302 (6th Cir. 1969). Where an agent is relied on to prepare and file a return, the agent's failure to require that the taxpayer execute the return prior to its due date should put the taxpayer on notice that his reliance is not an exercise of ordinary business care and prudence. Fleming v. United States,648 F.2d 1122, 1126 (7th Cir. 1981); *625 United States v. Kroll,547 F.2d 393, 396 (7th Cir. 1977). This Court, however, has previously held that reasonable cause existed in cases where a taxpayer, pursuant to a procedure that he customarily followed, furnished a fully prepared and executed return to an agent and relied upon the agent solely to perform the necessary ministerial act of filing the return, but the return was filed beyond the prescribed period as a result of an inadvertent oversight during an established office routine.[12] *626 Hammonton Investment and Mortgage Co. v. Commissioner,T.C. Memo. 1959-212, affd. per curiam on another issue, 284 F.2d 950 (3rd Cir. 1960) (due to a clerical error, the original and copy of the return were placed in a file), Bouvelt Realty, Inc. v. Commissioner,46 B.T.A. 45 (1942) (employee of legal representative of taxpayer inadvertently placed completed return in file with copies of returns of other corporations); Carnie-Goudie Manufacturing Co. v. Commissioner,18 B.T.A. 893, 900 (1930). [13] It may be questioned whether the preceding cases continue to have any vitality (See footnote 12, supra). We, however, leave that question for another day, when we are faced with a case embodying facts indistinguishable from the facts in those cases. Here, petitioners have not shown that their tardy *627 filing was the result of an inadvertence which occurred during a normal office routine. [14] Nor have petitioners, for that matter, established why Lucas failed to timely file their return and we cannot speculate on his failure to do so. In these circumstances, we must hold that petitioners have not established that they exercised ordinary business care and prudence by relying on Lucas to file the return and, therefore, they have not established that the untimely filing of their 1976 tax return was due to a reasonable cause and not due to willful neglect. See Conlorez Corp. v. Commissioner,51 T.C. 467, 473-474 (1968). Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. Isle of Palms Beach and Racquet Club Company, Inc., was originally incorporated as Charleston Beach and Racquet Club Company, Inc.↩
3. Since 1954, Willis has been involved, either as a principal stockholder of various corporations or as a partner, in the business of developing for resale residential lots and subdivisions, as well as commercial and industrial properties. At the trial of this case, Willis estimated the total value of the real estate developed by him, through corporations and partnerships, as being between 35 and 40 million dollars.
4. On April 19 1976, when Caveness met with Willis, Caveness may have had with him a copy of the April 7, 1976, agreement between Ravenel and Finch Properties. Caveness and Willis both testified that they could not recall when Caveness first showed the agreement to Willis.↩
5. Although the amount of $14 should be treated as a business expense, respondent has accepted petitioners' treatment of it for purposes of this case.↩
6. Section 1234 was amended by sec. 2136(a), Pub. L. 94-455, 90 Stat. 1929. The amendments are effective for options granted after September 1, 1976.
7. Petitioners have not challenged respondent's assertion that if they had acquired the stock of the corporation, the note and mortgage, and the contractual rights, they would have acquired capital assets.↩
8. Petitioners introduced into evidence copies of the stubs of the checks paid to Colonial American National Bank for the cashier's checks by which the payments in issue were made to Finch Properties. They have called our attention to the fact that some of the stubs bear notations indicating that the checks related to a "Land Option." We believe that the notations are as consistent with the making of payments to acquire an option to purchase a bundle of rights that provide control over land as with the making of payments to acquire an option to purchase land. In any event, the question whether the payments by Willis to Finch Properties resulted in the acquisition of an option to purchase land depends on the economic substance of the transactions between them and not the form utilized by petitioner to record the payments on his check stubs. Gregory v. Helvering,293 U.S. 465↩ (1935).
9. During cross-examination, when Willis was questioned as to whether he ever attempted to get his $42,000 back from Finch Properties, he testified as follows: * * * No, the $42,000, or the first give payments, if we'd exercised the option -- the first five payments were to have been credited against the purchase price. That's the reason I hesitated. I knew there was some tie-in there. But an attempt to get my money back, no, because I thought I was paying option money. And if you don't exercise an option, you lose your money. That's what you pay for, is the right to go ahead with the deal. Otherwise you lose. We note that, since Willis made his first five payments prior to May 24, 1976, his understanding that credit against the purchase price would be received for such payments is consistent with paragraph 10 of the agreement and option executed on May 24, 1976. As noted in our findings of fact, that paragraph provided that Caveness would receive credit against the purchase price for payments made prior to the agreement and option's effective date, i.e., May 24, 1976.↩
10. The cases cited by petitioners merely support the proposition that when a taxpayer has advanced beyond the stage of making a preliminary investigation and entered into negotiations to purchase a business which are sufficient to give rise to a "transaction," the expenses incurred in such transaction, if the taxpayer is compelled to abandon it, are deductible under section 165(c)(2). Here respondent has admitted that the loss sustained by Willis is deductible, but disagrees with petitioners' characterization of it. Since, as earlier noted, under section 165(f) losses from the sale or exchange of capital assets are allowed only to the extent allowed in sections 1211 and 1212, the cases cited by petitioners are inapposite. (See section 1234(a) treating a loss on failure to exercise an option as a sale or exchange↩ of the property to which the option relates.)
11. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;
12. More recently the cases involving delegation of both the preparation and filing duties by a taxpayer to an agent were relied upon to find that no reasonable cause existed when taxpayers merely delegated their responsibility for filing returns to an agent who they knew had prepared the returns. Forni v. Commissioner,T.C. Memo. 1975-254. See also dicta in Sanderling, Inc. v. Commissioner,66 T.C. 743, 759 (1976), affd. in part and revd. in part 571 F.2d 174 (3rd Cir. 1978), stating that mere reliance on an expert to perform the ministerial function of filing the return is insufficient to establish reasonable cause. See also Goff v. Commissioner,T.C. Memo. 1978-36↩, n. 4. 13. See also Levine v. Commissioner, Jr.,T.C. Memo. 1963-230; United Aniline Co. v. Commissioner,T.C. Memo. 1962-60; Fields v. Commissioner,T.C. Memo. 1955-8 (taxpayer's return was inadvertently placed in the file of another client of public accountant); Kaufmann v. Commissioner,↩ a Memorandum Opinion of this Court dated April 5, 1954 (employee of attorney inadvertently placed the completed return and check in the files).
14. The only evidence that we have before us which was submitted to establish inadvertence is the following testimony of Lucas: I don't know what happened to the return. I have in my file that I mailed that return on July 25, 1977. But I do not know what happened to it between the time that he gave it to me and the time it was actually mailed. It's my responsibility to see that that's done. I assume it was misplaced in our office.↩